# United States Court of Appeals
### For the
# Fifth Circuit

---

JOHN FORD, FORMER OFFICER JOHN DOE POLICE OFFICER,

*Plaintiff-Appellant*,

− v. −

DERAY MCKESSON; BLACK LIVES MATTER; BLACK LIVES
MATTER NETWORK, INCORPORATED,

*Defendants–Appellees.*

---

Appeal from the United States District Court
for the Middle District of Louisiana
3:16-CV-742

## APPELLEE DERAY MCKESSON'S BRIEF

David T. Goldberg
DONAHUE & GOLDBERG LLP
240 Kent Avenue
Brooklyn, NY 11249
(212) 334-8813

Vera Eidelman
Ben Wizner
Brian Hauss
Emerson Sykes
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org

*Counsel continued on next page*

i

William P. Gibbens
Ian Atkinson
SCHONEKAS, EVANS, MCGOEY &
    MCEACHIN, LLC
909 Poydras Street, Ste 1600
New Orleans, LA 70112
(504) 680-6050

David D. Cole
600 New Jersey Ave. NW
Washington, DC 20001
(202) 622-9078

Nora Ahmed
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF LOUISIANA
P.O. Box 56157
New Orleans, LA 70156
(504) 522-0628

*Attorneys for DeRay Mckesson*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. John Ford, Plaintiff-Appellant

2. Donna Grodner, Esq., Grodner & Associates
   Attorney of Record for John Ford

3. DeRay Mckesson, Defendant-Appellee

4. William P. Gibbens, Esq., Schonekas, Evans, McGoey & McEachin, LLC
   Attorney of Record for DeRay Mckesson

5. Ian Atkinson, Esq., Schonekas, Evans, McGoey & McEachin, LLC
   Attorney of Record for DeRay Mckesson

6. David T. Goldberg, Donahue & Goldberg, LLP
   Attorney of Record for DeRay Mckesson

7. Vera Eidelman, American Civil Liberties Union Foundation
   Attorney of Record for DeRay Mckesson

8. Ben Wizner, American Civil Liberties Union Foundation
   Attorney of Record for DeRay Mckesson

9. Brian Hauss, American Civil Liberties Union Foundation
   Attorney of Record for DeRay Mckesson

10. Emerson Sykes, American Civil Liberties Union Foundation
    Attorney of Record for DeRay Mckesson

11. Nora Ahmed, American Civil Liberties Union Foundation of Louisiana
    Attorney of Record for DeRay Mckesson

12. David D. Cole
    Attorney of Record for DeRay Mckesson

13. Black Lives Matter Network, Inc., Dismissed Defendant

14. Chloé M. Chetta, Esq., Barrasso, Usdin, Kupperman, Freeman
    & Sarver, LLC
    Attorney of Record for Black Lives Matter Network, Inc.

Respectfully Submitted,

/s/ *Vera Eidelman*
Vera Eidelman

# REQUEST FOR ORAL ARGUMENT

This case has already resulted in five opinions by this Court—an initial opinion; a second on rehearing; a third issued with a dissenting opinion, which eight judges would have reheard en banc; a fourth issued after vacatur and remand from the Supreme Court; and a fifth after certification to the Louisiana Supreme Court. Every one of these opinions was issued without the benefit of oral argument.

Though the District Court properly granted summary judgment, the novelty of the legal issues involved, as well as the numerous evidentiary issues with the purported factual record, suggest that oral argument would be helpful in resolving this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS......................................................... iii

REQUEST FOR ORAL ARGUMENT..................................................................... v

TABLE OF AUTHORITIES................................................................................ viii

STATEMENT OF ISSUES ...................................................................................1

STATEMENT OF THE CASE...............................................................................1

SUMMARY OF ARGUMENT...............................................................................5

STANDARD OF REVIEW ...................................................................................8

ARGUMENT ......................................................................................................9

    I.  Ford failed to point to evidence sufficient for the negligence claim
        to proceed. ................................................................................................9

        A.  Only a "protest leader" can be liable for negligent protest-
            leading. .........................................................................................10

        B.  The record fails to show that Mckesson organized or led the
            Baton Rouge protest......................................................................12

            1.  The bulk of Ford's evidence cannot be considered. ............18

            2.  There is no evidence that Mckesson organized the
                protest or chose its location. ................................................21

            3.  There is no evidence that Mckesson personally
                assumed control of the protest's movements......................23

            4.  There is no evidence that Mckesson deliberately led
                the assembled protest into the street. ...................................30

            5.  Ford's remaining evidence does not support his
                allegations. ..........................................................................32

        C.  Without proof that Mckesson organized or led the protest,
            Ford cannot establish that he bore a duty, much less that he
            breached it. ....................................................................................33

    D. The record fails to show that Mckesson was the cause-in-
        fact of Ford's injuries. ....................................................................36

  II. The First Amendment requires judgment for Mckesson as a matter
     of law. ...........................................................................................38

CONCLUSION ......................................................................................41

CERTIFICATE OF COMPLIANCE .......................................................42

# TABLE OF AUTHORITIES

**Cases**

*Chaney v. Dreyfus Serv. Corp.*,
   595 F.3d 219 (5th Cir. 2010) ................................................................8

*Clark v. City of Alexandria*,
   116 F.4th 472 (5th Cir. 2024) ............................................. 8, 13, 14, 27

*Counterman v. Colorado*,
   600 U.S. 66 (2023) ...................................................................... passim

*Davis v. United States*,
   417 U.S. 333 (1974) .......................................................................40

*Doe v. Mckesson*,
   71 F.4th 278 (5th Cir. 2023) ......................................................... passim

*Frisby v. Schultz*,
   487 U.S. 474 (1988) .......................................................................35

*Hague v. Comm. for Indus. Org.*,
   307 U.S. 496 (1939) .......................................................................35

*In re Adams*,
   734 F.2d 1094 (5th Cir. 1984) ..........................................................9

*Johnson v. Purpera*,
   320 So. 3d 374 (La. 2021) ...............................................................12

*Jones v. United States*,
   936 F.3d 318 (5th Cir. 2019) .............................................................8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .......................................................................20

*McCullen v. Coakley*,
   573 U.S. 464 (2014) .......................................................................35

*Miller v. Michaels Stores, Inc.*,
   98 F.4th 211 (5th Cir. 2024) ........................................................9, 25

*Musacchio v. United States,*
    577 U.S. 237 (2016) ............................................................................20

*NAACP v. Claiborne Hardware Company,*
    458 U.S. 886 (1982) .................................................................. 12, 15, 16

*New York Times v. Sullivan,*
    376 U.S. 254 (1964) ............................................................................39

*Nola Spice Designs, LLC v. Haydel Enters. Inc.,*
    783 F.3d 527 (5th Cir. 2015) .................................................................8

*Patel v. Texas Tech Univ.,*
    941 F.3d 743 (5th Cir. 2019) ............................................................9, 16

*Romero v. Thomson Newspapers (Wisconsin), Inc.,*
    648 So. 2d 866 (La. 1995) ...................................................................13

*Scott v. Harris,*
    550 U.S. 372 (2007) ............................................................................31

*Transamerica Ins. Co. v. Avenell,* 6
    6 F.3d 715 (5th Cir. 1995) .....................................................................8

*Warren v. Fed. Nat'l Mortg. Ass'n,*
    932 F.3d 378 (5th Cir. 2019) ............................................................9, 19

## Other Authorities

Complaint, *Mckesson v. City of Baton Rouge*, No. 16-520 (M.D. La. Aug. 4, 2016), ECF 1 ..............................................................................................32

Joint Motion for Approval of Settlement Agreement, *Mckesson  v. City of Baton Rouge*, No. 16-520, ECF 52, Ex. A.....................................................33

## Rules

Fed. R. Evid. 404 .......................................................................................28

Fed. R. Civ. P. 23.......................................................................................33

Fed. R. Civ. P. 37.......................................................................................16

Fed. R. Civ. P. 56....................................................................................8, 16

## STATEMENT OF ISSUES

1.      Whether the District Court properly granted summary judgment because Ford failed to adduce evidence showing that Mckesson led or organized the Baton Rouge protest, as a result of which he could prove neither that Mckesson owed him a duty nor that he breached it.

2.      Whether the District Court properly granted summary judgment because Ford failed to offer evidence showing that Mckesson was the cause-in-fact of his injuries.

3.      Whether the District Court correctly recognized that the Supreme Court's First Amendment jurisprudence, including *Counterman v. Colorado*, 600 U.S. 66 (2023), which post-dated this Court's most recent opinion, entitled Mckesson to summary judgment.

## STATEMENT OF THE CASE

Appellant John Ford seeks to hold Appellee DeRay Mckesson, a well-known activist, liable for injuries Ford incurred when he was struck by a projectile at a July 9, 2016 Baton Rouge protest attended by Mckesson. Rather than sue the person who threw the hard object at his head, Ford argues that Mckesson is the responsible party because, he alleges, Mckesson organized, led, and directed the protest, and did so in such a negligent way that he breached a duty to Ford and in fact caused Ford's injuries.

This Court, reviewing the case at the pleading stage, allowed Ford's negligence claim to proceed to discovery because Ford had "plausibly alleged that Mckesson breached his duty in the course of [his] organizing and leading" the Baton Rouge protest. *Doe v. Mckesson*, 71 F.4th 278, 288 (5th Cir. 2023). In particular, the Court concluded that Ford's allegations that Mckesson "created unreasonably unsafe conditions [sufficed] in at least three significant respects." *Id.* at 292. First, Ford had alleged that Mckesson "organized the protest to begin in front of the police station, obstructing access to the building." *Id.* Second, he had alleged that Mckesson "personally assumed control of the protest's movements," but failed to do anything to prevent others from "loot[ing] a grocery store and throw[ing] items at the assembled police." *Id.* And third, according to Ford's complaint, "Mckesson deliberately led the assembled protest onto a public highway, in violation of Louisiana criminal law." *Id.*

In response to Mckesson's argument that these allegations could not state a claim without violating the First Amendment, the Court emphasized that the negligence tort at issue in this case is limited to protest leaders and cannot extend to protest participants. *Id.* at 290–94, 297. And though the Court concluded that Ford stated a claim on the basis of his *allegations*, it emphasized the daylight between successfully "pleading a negligence claim" at the motion-to-dismiss stage and establishing it. *Id.* at 289. The latter, it explained, would be a "tall task." *Id.* at 292.

While Mckesson disagreed with the Court's First Amendment analysis and sought certiorari, proceedings continued in the District Court. On August 15, 2023, Ford filed an amended complaint, asserting only a negligence claim against Mckesson. ROA. 1131–46. On August 25, 2023, Mckesson filed an answer, ROA. 1154–63, and the District Court ordered the parties to complete fact discovery by December 31, 2023. ROA. 1152–1153. Ford did not object to any deadlines or complain that he did not have adequate discovery.

In January 2024, Mckesson moved for summary judgment, principally emphasizing that Ford had failed to present any evidence that Mckesson organized or led the protest. ROA. 1165–79. Ford opposed, ROA. 1583–1610, and Mckesson replied, ROA. 1943–51.

On July 10, 2024, the District Court granted summary judgment because, "despite the benefits of open and extensive discovery," Ford had been "unable to substantiate his claims with competent evidence." ROA. 1988. Notwithstanding Ford's violation of the court's local and federal evidentiary rules, including his efforts to rely on evidence that could not be admissible even at trial, the District Court closely and thoroughly reviewed the record. ROA. 1982 n.1.

The court found that "Plaintiff's original allegations regarding Mckesson's 'leadership,'" on which this Court and the Louisiana Supreme Court critically relied, were not substantiated. ROA. 1990. "[T]here is no evidence that Defendant

'arranged for the protesters to meet in front of the police station, and block entry to the station and access to the adjacent streets," ROA. 1988 (quoting Am. Compl. ¶24) (alterations omitted); that he "'was directing the protesters'" "'at all times,'" *id.*; that he "planned," "organized," "staged," or "was in charge of the protest[ ]"; or that he "was seen and heard giving orders throughout the day and night of the protests," *id.* (quoting Am. Compl. ¶¶28, 29, 30, 33). In other words, the key allegations regarding Mckesson's leadership role were "reduced to a shred by discovery." ROA. 1990.

"[B]ecause Defendant cannot be liable for the organization and leadership of a protest he did not organize or lead," the District Court found "that Defendant owed no duty to Plaintiff [under Louisiana law]," ROA. 1988, and that Ford "fail[ed] to establish cause-in-fact and breach." ROA. 1989. It concluded that "extend[ing] liability to Mckesson . . . would represent a major expansion of tort liability," one "unsupported by" Louisiana law, and would, in contravention of this Court's decision, "dramatically increase" the risk of damages liability for "protest participants—not just protest leaders." ROA. 1990.

In the alternative, the District Court held that Ford's claim "independently . . . fail[ed]" in light of the Supreme Court's decision in *Counterman v. Colorado*, issued two weeks after this Court's most recent opinion, which "made clear that the First Amendment bars the use of 'an objective standard' like negligence"—the only

claim remaining here—"when it comes to punishing speech." ROA. 1991–92 (quoting *Counterman*, 600 U.S. 66, 78, 79 n.5 (2023)).

Ford now seeks this Court's review. Yet the bulk of Ford's evidence shows, at most, that Mckesson is known as a prominent voice in the Black Lives Matter ("BLM") movement—akin to a protester in the 1960s being known as an anti-war activist or civil rights leader or, in later years, those recognized as leaders in the pro-life or Tea Party movements. And his remaining evidence fails to show the level of organization, planning, or leadership at the Baton Rouge protest specifically that would be necessary to make out Ford's negligent protest-leading claim.

## SUMMARY OF ARGUMENT

Ford seeks to hold Mckesson liable for breaching a duty that this Court has made clear can be imposed only on protest leaders. At the motion-to-dismiss stage, the Court allowed Ford's claim to proceed because his complaint had alleged that Mckesson was the one who planned, organized, and arranged the Baton Rouge protest. Yet, as the District Court properly concluded, discovery has not borne out these claims.

Much of the "evidence" Ford relies on is, as the District Court highlighted, inadmissible: it cannot be authenticated or tested for reliability; it constitutes hearsay (frequently double hearsay); it cannot be presented in an admissible form at trial; it relates to alleged past acts for an inadmissible purpose; or it is plainly irrelevant, in

violation of the Federal Rules and the District Court's Local Rules. Ford also leans heavily on his complaint's allegations, incorrectly referring to them as "facts." *See, e.g.,* Appellant's Br. at 3–4. Allegations are not evidence and, contrary to Ford's repeated attempts to suggest otherwise, they do not become facts merely because this Court recited them in its prior opinions at the motion-to-dismiss stage, where the pleadings must be accepted as true. Nor does this Court's having accepted an allegation as sufficiently pled make it law of the case as the litigation proceeds.

Even setting those issues aside, the evidence Ford points to does not suffice to establish the lynchpin of the cause of action he asserts: that Mckesson organized and led the protest. At most, the evidence shows that Mckesson is a well-known leader in a social movement, that he attended the July 9 protest, that he re-tweeted someone else's announcement of the Baton Rouge protest's time and location, and that some group of people followed him at various moments during the day. Simply being a well-known activist who attends a protest cannot open a person up to protest-leader liability. And if mere evidence of attending a protest, posting already-determined details about it, and walking around with a group sufficed, the constitutionally critical distinction between leaders and participants that this Court relied upon in its prior decision would dissolve. Ford cannot establish that Mckesson owed him a duty, much less that he breached it.

The record also fails to show that Mckesson was the cause-in-fact of Ford's injury, an independently necessary element of his claim. Ford argues that Mckesson caused his injury because his negligence forced Ford's team to make arrests, but Ford's own testimony shows that there were "a lot" of "agitators" in the crowd that night, each of whom necessitated arrests. ROA. 1662, 1664. It also shows that objects were being thrown at officers throughout the day and night, without any specific nexus to Mckesson's actions, or even presence, at the protest. Equally, much of Ford's evidence, if admissible, shows that road-trespassing, arrests, and isolated acts of violence occurred at protests where Mckesson was not even present, much less the leader. Thus, Ford has failed to show that anything Mckesson did was the but-for cause of his specific injury.

Finally, even if Ford's failures with respect to the negligence elements were less manifest, the Supreme Court's decision in *Counterman v. Colorado* would compel affirmance of the judgment below. That decision, issued after this Court's most recent opinion addressing the constitutional issue, makes clear that holding a protest leader liable based on negligence violates the First Amendment. In *Counterman*—a case involving private threats of violence, activity substantially further from the First Amendment's core concerns than the political protest at issue here—the Supreme Court explained that the First Amendment requires "adoption of a subjective mental-state element" and "ban[s liability based] on an objective

standard." 600 U.S. at 73, 78. This lawsuit, predicated on an alleged breach of a standard of care, may not go forward for that reason alone.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo and must be affirmed when the record fails to show a "genuine dispute as to any material fact." *Clark v. City of Alexandria*, 116 F.4th 472, 478 (5th Cir. 2024) (quoting Fed. R. Civ. P. 56(a)). "A fact is material only if its resolution would affect the outcome of the action, and an issue is genuine only if the evidence is sufficient for a reasonable party to return a verdict for the nonmoving party." *Id.* at 478–49 (citation omitted). "Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact[.]'" *Nola Spice Designs, LLC v. Haydel Enters. Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995)).

In making that determination, the Court does not "accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions," *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010), nor can "[a] non-movant . . . avoid summary judgment by presenting . . . improbable inferences." *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019). Equally, "[h]earsay is not competent summary judgment evidence . . . unless its proponent can show that the

statement can be presented in an admissible form at trial." *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 218 (5th Cir. 2024) (citing *Patel v. Texas Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019)).

Where "a district court [has decided] to exclude evidence in connection with a summary judgment motion," this Court reviews the evidentiary determinations "under the abuse of discretion standard." *Warren v. Fed. Nat'l Mortg. Ass'n*, 932 F.3d 378, 383 (5th Cir. 2019). And because "[c]ourts have broad discretion in interpreting and applying their own local rules adopted to promote efficiency in the court," "considerable deference is accorded to the district court's interpretation and application of its own rule[s]." *In re Adams*, 734 F.2d 1094, 1102 (5th Cir. 1984) (citation omitted).

## ARGUMENT

### I. Ford failed to point to evidence sufficient for the negligence claim to proceed.

This Court has made clear that, to the extent that negligence liability is authorized and permissible in the protest context, it cannot extend beyond "*protest-leader* liability." *Doe*, 71 F.4th at 291, 297 (emphasis added). Such liability is confined to those who plan, lead, and organize protests. And even with respect to protest leaders, a plaintiff must offer evidence of all five elements of a negligence claim under Louisiana law—injury, duty, breach, cause-in-fact, and risk within

duty's scope—to survive summary judgment and avoid chilling First Amendment protected activity. *Id.* at 288.[1]

The standards for proving such a claim "are demanding," "and they will only be met in the most unusual of cases." *Id.* at 299. This is not such a case. Ford has not offered evidence showing that Mckesson led the Baton Rouge protest and so cannot establish that he owed Ford any duty, that he breached it, or that the risk of harm was within the scope of the duty's protection. Even if Ford could establish those elements, no reasonable juror could find that Mckesson was the cause-in-fact of Ford's injuries. Allowing Ford's claim to proceed to trial would therefore both contravene Louisiana tort law and violate the First Amendment.

### A. Only a "protest leader" can be liable for negligent protest-leading.

A defendant's status as a leader of the protest permeates the elements of the negligence claim at issue here, and there is no question that only a protest leader may be held liable for it. As explained by this Court, the limitation to protest leaders is necessary as a matter of both Louisiana tort and First Amendment law.

Under Louisiana law, the relevant duty is a "duty to *organize and lead* [a] protest with reasonable care." *Id.* at 289 (emphasis added). *See also id.* at 284 (duty

---

[1] Though this Court has held that protest-leader liability is constitutionally permissible, Mckesson maintains that, even as limited to protest leaders, the negligence claim at issue violates the First Amendment. *See* Petition for En Banc Rehearing at 7–13, *Doe v. Mckesson*, No. 17-30864 (5th Cir. June 7, 2019), ECF 89-1; *see also infra* Section II.

to "exercise reasonable care in *organizing* [a] protest") (emphasis added); *id.* at 299 (considering liability for "protesters who *organize and lead* demonstrations") (emphasis added); *id.* at 297–98 (discussing "concept of liability for *protest leaders*") (emphasis added). And the relevant breach is "*organizing* the protest" in a negligent manner. *Id.* at 284 (emphasis added). *See also id.* at 288 (question is whether Mckesson "breached his duty *in the course of . . . organizing and leading* the . . . protest at issue here") (emphasis added). The pertinent risk falls within the duty's scope because "a central purpose of imposing a duty in these circumstances is to protect those who are injured as a result of a *negligently organized and led* protest." *Id.* at 289 (emphasis added).

This Court held that the limitation to leaders is also required by the First Amendment. In this Court's telling, "the nature of culpability required to hold an associate liable for unlawful conduct taken in the midst of legitimate expressive behavior" differs from "that required to hold a protest leader liable." *Id.* at 297. When it comes to leaders, the Court reasoned, negligence-based liability is permissible because "[l]eaders are far more responsible for the organization's operations and therefore have a closer connection to unlawful activities committed by its members." *Id.* at 297; *see also id.* at 298 (permitting "tort liability where . . . the defendant personally directs the activities of others"). But when it comes to mere protest participants and associates, "imposing liability . . . without an intent requirement

would risk discouraging a whole range of legitimate expressive activities," crossing the First Amendment line. *Id* at 297.

This Court also viewed the protest-leader limitation as necessary to ensure consistency with *NAACP v. Claiborne Hardware Company*, 458 U.S. 886 (1982), reiterating that, "[f]or an associate, the plaintiff must show that the defendant 'held a specific intent to further' the organization's 'illegal aims.'" *Doe,* 71 F4th at 297 (quoting *Claiborne,* 458 U.S. at 920); *see also id.* at 291–94 (relying on Ford's allegations that Mckesson "direct[ed]" and "organized" the protest to explain how "the negligence theory [Ford] pursues fits quite comfortably into two of the theories for protest-leader liability identified in *Claiborne*").

## B.     The record fails to show that Mckesson organized or led the Baton Rouge protest.

This Court has defined what it means to be a protest leader for the purposes of this negligence cause of action and the First Amendment: The "leader" "organize[s] and direct[s]" the protest, *id.* at 287, 293, 295, and thus "ha[s] a closer connection to unlawful activities committed by" attendees than do the other protesters, *id.* at 297.[2]

---

[2] Because this case considers a novel negligence theory, it has not yet been determined whether this is a question of fact to be resolved by a jury or a question of law or of constitutionally-significant fact to be resolved by a judge—along the lines of a plaintiff's "public figure" status or "whether words are capable of a particular meaning and whether that meaning is defamatory" in a defamation case. *See, e.g.*, *Johnson v. Purpera*, 320 So. 3d 374, 388 (La. 2021). Equally, it has not yet

Throughout its opinion, the Court highlighted the allegations it viewed as essential to support protest-leader liability in this case—the allegations that Ford would be tasked with substantiating at summary judgment: that "Mckesson organized the protest," *id.* at 281; "arranged" the protest, *id.*; "planned" the protest, *id* at 283, 288; "operate[d]" the protest," *id.* at 293, 294; "was 'in charge' of the protest at all times, and regularly 'gave orders' to the demonstrators," *id.* at 283; "personally directed [the protest] at all times," *id.* at 288; "personally direct[ed] the activities of others," *id.* at 298; "personally assumed control of the protest's movements," *id.* at 292; and "personally led the protest in the field and directed its movements," *id.* at 293.

There is no competent evidence of any of that in this case. Occasionally citing to the record, occasionally pointing to his brief, this Court's motion-to-dismiss opinion, or the District Court's opinion below, and occasionally citing to nothing at all,[3] Ford maintains that the record shows that: Mckesson was a prominent activist

_____

been determined whether one's role as a protest leader is a fact that would require clear and convincing evidence—"a difficult burden" to meet—as for a determination of actual malice in a defamation case. *See, e.g.*, *Romero v. Thomson Newspapers (Wisconsin), Inc.*, 648 So. 2d 866, 869 (La. 1995). In any event, no reasonable factfinder could conclude that the record here suffices to substantiate that Mckesson organized or led the Baton Rouge protest.

[3] As "the party opposing summary judgment," Ford must "identify specific evidence in the record" and "articulate the precise manner in which [it] supports his . . . claim." *See Clark*, 116 F.4th at 478 (citation omitted). Yet Ford consistently cites to full ranges of pages in his opposition brief below, without identifying what specific evidence he is relying on, much less how it supports his argument. *See, e.g.*, Br. at

in the Black Lives Matter movement, Br. at 29, 33; that Ford heard at police briefings (run by officers he could not name, based on information from unidentified "informants" and unknown officers elsewhere in the country) that Mckesson was expected to be a "leader" of the protest, *id.* at 30; that Mckesson re-tweeted a post on Twitter that included the time and place of the Baton Rouge protest, *id.* at 25–26, 27; that, during the protest, some people followed Mckesson around a parking lot and onto the street and that (based on hearsay from officers he could not name and his own inconsistent testimony) Mckesson at some point told some number of people in his vicinity to walk into the street, *id.* at 27–28, 32; that Mckesson's video of his own arrest shows him at the rear of the crowd, which meant he'd been at the front before police turned the protest around, *id.* at 23–24; and that, after the protest, Mckesson spoke to the press and was a lead plaintiff in a class action civil rights suit against the City of Baton Rouge, *id.* at 11—one that resulted in the City's agreeing to expunge, at its own expense, Mckesson's and other class members' arrest records and pay each compensation for their detention.

Evidence regarding Mckesson's general leadership in a social and political protest movement cannot suffice without opening up all well-known activists,

---

32 (in sum, citing more than twenty pages of his brief below to support eight "facts"); Br. at 8 (purporting to fully incorporate that brief, which itself exceeded the lower court's typical page limitations, *see* ROA. 1220). A plaintiff's "complaint does not count as summary judgment evidence, nor do his motions or responses." *Clark*, 116 F.4th at 480. Ford has failed to carry his burden on appeal for these reasons alone.

possibly including Charles Evers, *Doe*, 71 F.4th at 293, to liability; much of this evidence would be inadmissible even at trial; and the facts Ford relies on most heavily would bring almost any protest participant into the liability-laden category of "protest leader."

Neither being "a protest leader" in some generic sense nor playing a well-known role in a movement can be enough to open a person to liability. *Id.* at 293. Otherwise, any prominent activist could be liable for simply attending a protest organized, controlled, and led by others. Indeed, as this Court explained in distinguishing *Claiborne*, though "[t]o be sure, [Charles] Evers was a protest leader and gave various speeches relating to the boycott," he was not the kind of leader who could be liable for any violence or illegality that occurred during the boycott because he lacked a sufficiently "close[ ] connection to the unlawful components of the protest." *Id.* According to the Court, this case was distinguishable based on Ford's allegations that "Mckesson personally led the protest in the field and directed its movements." *Id.* Ford's evidence does not support the distinction this Court relied upon in his allegations.[4]

---

[4] Even if this were read to distinguish Evers' role in *Claiborne* not because he wasn't the "leader," but because he never *breached* his protest-leader duty by participating in unlawful acts, Ford's evidence nevertheless fails to show that Mckesson was the necessary kind of "leader" in Baton Rouge. As reflected by the evidence, Mckesson's actual role fell far short of the level of control and leadership Evers exerted over the boycott in *Claiborne*. Evers "helped organize the Claiborne County Branch of the NAACP," *Claiborne*, 458 U.S. at 898; signed the letter that set forth the boycotters'

For this reason, the District Court correctly concluded that "[b]ased on the competent summary judgment evidence . . . it is apparent that [Mckesson] did not organize or lead the protest." ROA. 1983–84. Notwithstanding Ford's repeated failures "to abide by the Federal Rules and the [trial court's] Local Rule 56," ROA. 1982 n.1, to respect this Court's instructions that any evidence considered at summary judgment must be capable of "'be[ing] presented in admissible form at trial,'" *id.* (quoting *Patel*, 941 F.3d at 746), or to offer evidence that is relevant "to the issues raised in Defendant's Motion," *id.*, the court went out of its way to consider the entirety of the record.[5]

---

demands, *id.* at 926; "successfully convinced" others to join the boycott, *id.*; "presided at the . . . meeting at which the vote to begin the boycott was taken," *id.*; and delivered rousing speeches to several hundreds of people in the Claiborne County community on key dates for the boycott, *id.* at 900, 902. Ford has not offered evidence showing that Mckesson exerted anywhere close to that level of leadership, control, or design. *See infra* section I.B.2–5.

[5] Ford offered 38 exhibits at summary judgment, yet "did not disclose *a single one* to [Mr. Mckesson] in discovery." ROA. 1982 n.1. On appeal, he argues that that's excusable because "*Rule 56* does not limit evidence offered on summary judgment to only those items produced during discovery." Br. at 15 (emphasis added). But that ignores the fact that *Rule 37* does: "If a party fails to provide information or identify a witness . . ., the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). Ford's arguments now that some of his submissions might be admissible as impeachment evidence and that the trial court's discovery schedule was too fast did not absolve him of his obligation to explain his failure to the District Court in order to be excused. *Id. See also* Fed. R. Civ. P. 56(d). And even if Ford's references to Exhibits 7, 22, and 19 in his Amended Complaint were enough to satisfy the disclosure requirement, merely discussing the claims made in the other exhibits with (and having them denied by) Mckesson in his deposition—without ever mentioning the exhibits themselves or identifying them as the source—or

The District Court rigorously "conducted an independent review of the summary judgment evidence" because it recognized that "this case, now seven years old, demands resolution." *Id.* Upon completely and fairly—indeed indulgently—considering the record, the District Court recognized that it contained evidence that Mckesson "may have encouraged some protesters into the road at some point during the protest," but that such encouragement was legally insufficient "to hold him liable *in negligence* for Plaintiff's injuries," ROA. 1985 (emphasis added), because it failed to establish that he "planned the protest," that he "organized or staged the protest," or that he "was in charge." ROA. 1988. The other evidence Ford pointed to—"a tweet of the location and time of the protest that Defendant acknowledged re-tweeting," coupled with Ford's reliance on Mckesson's deposition testimony that "he did not know the organizers personally, and only met them on the night of the protest," ROA. 1983—was even less availing. ROA. 1984. "In practically every way," the Court concluded, "Plaintiff's evidence has fallen short of his allegations." ROA. 1988. At most, Mckesson played a "minor . . . role"—one that involved no planning or control. ROA. 1990.

A review of the record, particularly compared to the allegations this Court previously identified as material, confirms that the District Court was correct.

---

merely pleading information contained in the articles as allegations without identifying any source in his Amended Complaint cannot possibly suffice to satisfy the obligation.

1. <u>The bulk of Ford's evidence cannot be considered.</u>

The District Court correctly found that the vast majority of Ford's evidence would not be admissible at trial, based on specific evidentiary objections Mckesson raised below, *see* ROA. 1943–46, and so should not be considered at summary judgment. ROA. 1982 n.1.

Turning first to the 15 photographs Ford submitted,[6] Mckesson objected that they were "unauthenticated," that "Ford ha[d] not identified any witness who could authenticate them," and that they were irrelevant since not one depicted Mckesson. ROA. 1944. Ford now contends that these "will be readily identifiable as taken during the Baton Rouge BLM protest," Br. at 17, but still does not explain *how* that evidence would be authenticated or by whom, or how it is relevant to whether Mckesson led the protest.

Mckesson also objected to the "newspaper articles, internet postings, and a Wikipedia article" that Ford sought to rely on[7] because they "consist entirely of inadmissible hearsay," ROA. 1944–45, and are not subject to any hearsay exception.

---

[6] *See* ROA. 1762–67 (Ex. 3), 1768–1773 (Ex. 4), 1774 (Ex. 5), 1775 (Ex. 6), 1777 (Ex. 8), 1778 (Ex. 9), 1779 (Ex. 10), 1780 (Ex. 11), 1781 (Ex. 12), 1782 (Ex. 13), 1783 (Ex. 14), 1784 (Ex. 15), 1786 (Ex. 17), 1787 (Ex. 18), 1837 (Ex. 25).

[7] *See* ROA. 1776 (Ex. 7), 1788–89 (Ex. 19), 1790–1809 (Ex. 20), 1810–11 (Ex. 21), 1812–15 (Ex. 22), 1816–20 (Ex. 23), 1821–36 (Ex. 24), 1851–1872 (Ex. 27), 1873–77 (Ex. 28), 1878–93 (Ex. 29), 1894–97 (Ex. 30), 1898–1904 (Ex. 31), 1905–13 (Ex. 32), 1914–17 (Ex. 33), 1918–33 (Ex. 34), 1934–40 (Ex. 35).

Mckesson further explained that a declaration by a retired Baton Rouge officer, *see* ROA. 1785 (Ex. 16), is inadmissible because it "sa[id] nothing about Mckesson." ROA. 1945. And Mckesson objected to a video of "objects thrown" and a video of a different protest in Dallas, Texas because "Ford ha[d] not identified any witness who could authenticate them," *id.*, and finally to a video of an interview with CNN's Wolf Blitzer because it was "rife with hearsay statements." ROA. 1945.

As the District Court explained, each of these objections was correct. ROA. 1982 n.1. The vast majority of Ford's exhibits, the District Court found, were "problematic" such that they would not be capable of being presented in an admissible form at trial. *Id.* Specifically, this included the

> dozens of photographs taken by unidentified individuals with no suggestion that Plaintiff would be able to successfully authenticate the photos at trial; newspaper articles, internet posts, and a Wikipedia article, all of which constitute inadmissible hearsay…; a declaration by a retired Baton Rouge Police Department Officer that does not mention Defendant; and . . . a video filmed by an unidentified individual that does not depict Mckesson, an interview of Mckesson on CNN that does not specifically mention the Baton Rouge protest, and a video of a completely different protest in Dallas, Texas.

*Id.*

The District Court's evidentiary determinations control unless they are an abuse of discretion. *See Warren*, 932 F.3d at 383 (refusing to question district court's hearsay determination by inferring that an exception applied). Ford erroneously argues that they were an abuse of discretion because the District Court failed to specifically state what evidence it was excluding, Br. at 15, but he is wrong: it is

clear from the opinion that the District Court specifically identified the "problematic" exhibits. ROA. 1982 n.1. At most, the District Court may have exercised its discretion *in Ford's favor* to nevertheless consider some, in the interest of affording the full and thoughtful resolution the case deserves. *Id.* To the extent that the District Court gave Ford the benefit of its discretion, and still found his evidence wanting, that is not a reason to reverse these evidentiary determinations.

In addition, Ford errs in his reliance on his allegations, and this Court's prior decisions regarding the sufficiency of those allegations, as evidence or "law of the case." The Court's earlier descriptions of the complaint's allegations and Ford's theories of breach or causation at the motion-to-dismiss-stage do not constitute law of the case. That doctrine "generally provides that when a court decides upon a rule of *law*, that decision should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (citations omitted) (emphasis added). The same is not true when it comes to factual determinations. Instead, "each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As this Court noted, there is a world of difference between sufficiently pleading allegations at the motion-to-dismiss stage and substantiating them at summary judgment. *Doe*, 71 F.4th at 289.

2. <u>There is no evidence that Mckesson organized the protest or chose its location.</u>

This Court's opinion identified "three significant respects" in which Ford's complaint had alleged that Mckesson was the protest leader in Baton Rouge on July 9, 2016: Mckesson allegedly 1) "organized the protest to begin in front of the police station," 2) "personally assumed control of the protest's movements," and 3) "deliberately led the assembled protest onto a public highway." *Doe*, 71 F.4th at 292. Even setting aside the evidentiary issues, the record does not support any of these allegations, much less all three.

First, the evidence Ford points to as proof that Mckesson planned the protest and chose its location does no such thing. Ford relies heavily on the fact that Mckesson merely re-tweeted a social media post that stated the time and the place where protesters would gather. *See* Br. at 27 n.29, 29. But sharing the time and place of an event by copying an announcement someone else has already published does not establish (or even suggest) involvement in choosing those details in the first place. Re-tweeting the details of an already-planned protest no more makes one its organizer than would re-tweeting the time or location of an outdoor movie screening or church rummage sale.

Moreover, in an era of increasing online activism, imposing "protest-leader liability" on the basis of merely repeating information already published by someone else would run headlong into the "risk[s]" of "discouraging a whole range of

legitimate expressive activities" that this Court's decision strived to avoid by limiting any potential liability to *leaders*. *See Doe*, 71 F.4th at 297. And that cannot change based on the number of Twitter followers that a person has; otherwise, no well-known person could announce that they plan to attend a protest organized by others without opening the door to protest-leader liability.

The other evidence Ford points to—Mckesson's testimony that he learned of the Baton Rouge protest on Twitter after "a local organizer reached out to somebody from our team and asked us to come," ROA. 1747, 114:20–22, that he did not know the organizers personally, and that he only met with local activists the night before the protest—is even less availing. Far from making Ford's case, it highlights the extent to which the actual organizers and planners of the Baton Rouge protest were unknown to Mckesson: He never spoke to the person who apparently invited him to come to Baton Rouge, and he had no personal relationship or prior interactions with the local activists who organized the demonstration. Accordingly, Ford's suppositions that Mckesson led the protest are unsupported by any evidence.[8]

---

[8] While the question here is whether Ford offered sufficient evidence to proceed to trial, not whether Mckesson offered denials of that evidence that could win at trial, Ford is incorrect that the District Court erred when it found that Mckesson "repeatedly denied that he organized the Baton Rouge protest or led protestors there." Br. at 11. Mckesson did in fact repeatedly deny these claims. *See, e.g.,* ROA. 1842 (stating, in interrogatory response, that "Mr. Mckesson did not play any role in organizing the protest that took place in Baton Rouge on July 9, 2016"), ROA. 1738, 80:20–23 (stating, in deposition testimony, "Absolutely. Correct. I was not leading

If Mckesson had been involved in the planning, much less organized the entire protest, one would expect *some* correspondence with local organizers—certainly before the time and place of the protest were decided on and announced. Yet Ford pointed to, and the record shows, none. If Mckesson had organized the protest—particularly with, as alleged, an intent to block access to the Police Department premises and a plan to go on to obstruct a highway from there—one would expect him to have some knowledge of the layout of the streets around the Baton Rouge Police Department. Yet the record shows the opposite. *See, e.g.,* ROA. 1740, 85:15–18 (Mckesson testified that he "did not know anything about that area well").

3. There is no evidence that Mckesson personally assumed control of the protest's movements.

Ford's ostensible evidence that Mckesson "personally assumed control of the protest's movements," *Doe*, 71 F.4th at 292, fares no better. It consists largely of inadmissible hearsay. Even setting the evidentiary issues aside, it shows at most that Mckesson is known as a leader in the Black Lives Matter *movement*—something this Court has already made clear cannot give rise to liability without a clearer connection to the unlawful, harm-causing conduct at issue, *id.* at 293; that some subset of protesters followed Mckesson onto the street, but not that anyone took direction from him at any point, much less that he exercised control over the mass

them."), ROA. 1740, 85:12–13 (stating in deposition "I followed the people leading who were marching toward I-12").

of people present throughout the hours-long protest; and that he led (or participated in) chants—again, a role that is played by many protest participants and cannot show that one is a protest "leader."

Ford relies on his deposition testimony that, in the days preceding the July 9 incident, he attended departmental "briefings" at which officials he could not name informed officers that they had heard Mckesson "was on his way to Baton Rouge," ROA. 1630; had heard that he would be "leading [a] protest," *id*; and had heard of a "kick-off meeting" where a plan to "block that highway right in front of the police department" was discussed. ROA. 1690:3–11, 1645:6–20.

This "evidence" cannot properly be considered at summary judgment. It consists entirely of double hearsay, *see* ROA. 1645:6–7 (prefacing testimony with "[f]rom what they told us, the informant told them . . ."), and is further marred by Ford's inability to "for the life of [him] remember" the names of anyone who briefed him, ROA. 1637:2–6; *see also* ROA. 1632:16–1633:1, ROA. 1646:1–11, let alone to identify the sources of the underlying "information." ROA. 1627:18–1628:6, 1629:15–20.

Even if the evidence could be considered, it would fall short of showing Mckesson's leadership: the fact that officers *were told* Mckesson would be the leader does not mean he was, and any evidence that some people at a meeting that Mr. Mckesson is claimed to have attended talked about blocking the highway would not

mean that it was his plan, or one over which he exercised control. And, though Ford bore the burden of showing that this evidence could be presented in an admissible form at trial, *see Miller*, 98 F.4th at 218, he did not identify anyone who could offer this testimony directly; indeed, he confirmed that none of the people he listed as a potential witness on his interrogatory responses conducted the briefing, ROA. 1639:23–1641:15, ROA. 1642:6–1643:16. Nor has he otherwise explained how this double hearsay could be converted into admissible evidence at trial. Thus, these asserted recollections cannot help him resist summary judgment—not because they are self-serving, but because they are unreliable as a matter of law.

Ford also testified that he himself witnessed Mckesson leading protesters during the protest because "they were following him all over the area." ROA. 1654:1–2. When pressed on what precisely that meant, Ford referred to Mckesson's "body language." ROA. 1654:14–18. When pressed on what precisely *that* meant, he admitted he didn't "remember any signaling" or hand gestures to direct people, and mentioned merely Mckesson's "moving around." *Id.*, ROA. 1655:6–10. Ford also repeatedly testified that, though other officers—whom he could not name—later told him that they had heard Mckesson urging others to go into the street, he did not personally hear Mckesson say anything along those lines. "[N]o, I didn't—I didn't

hear him." ROA. 1708:10–14.[9] Indeed, he explained, he "wasn't standing there like other cops were," ROA. 1655:22–1656:3, and, though he allegedly could hear Mckesson's *chant*s, "it was too loud, you know, too much noise" for him to hear any "conversation" between Mckesson and any other protesters. ROA. 1650:5–22, ROA. 1653:6–12. In other words, he testified that, given where he was positioned, he *couldn't* have heard any such "orders" by Mckesson.

Ford later offered directly contrary testimony at the prompting of his attorney, who asked if he was having memory problems. Ford responded, "I did say that he told them to come out into the road, didn't I?" and then proceeded to state that he had in fact personally heard Mckesson encourage certain fellow protestors to march onto the road. ROA. 1708:6–14, ROA. 1708:22–1709:15. When a person "change[s]

---

[9] To support his contentions that he "heard Mckesson giving orders," Br. at 23, Ford cites to ROA. 1241, a page of his opposition brief below, which, on its face, reads as though Ford is testifying about what he heard Mckesson tell other protesters. But the brief's selective recitation of his testimony obscures the fact that Ford was describing what *other officers*—whose names he admitted he "do[es]n't know"—told him *they* heard "after the fact . . . just talking around the police department." ROA. 1660:16–1661:10; *see also* ROA. 1655:18–1656:20. He did not identify which officers he overheard saying that or suggest that they would appear as witnesses were the case to proceed to trial.

On that same page of his brief below, Ford also recites his testimony that Mckesson "could have told [people present] to stop" an alleged "looting" of water bottles from a convenience store and that they would have listened because "[h]e's the leader," ROA. 1241. But to withstand summary judgment, Ford cannot simply assert the effect of a hypothetical admonition based on his ipse-dixit conclusion that Mckesson was "the leader." He must offer evidence to back up those claims.

his tune" in response to questioning, rather than "com[ing] forward to correct the record on his own," "[e]ither he lied the first time, or he lied the second, but either way, he lied." *Clark*, 116 F.4th at 485.

In any event, as the District Court explained, even if a group of people walked behind Mckesson after he encouraged them to go into the road, that is not enough to show he controlled their movements, much less the movements of the hundreds of protesters in attendance. Concluding that such conduct is enough could make any person who attends a protest with a group of friends, who walks out into the street, and who happens to be someone others tend to follow, potentially liable for the unlawful acts of the hundreds of other people also, separately, in attendance.

Indeed, though Ford states that he heard Mckesson "the initial time that they went out into Airline Highway," ROA. 171:9–16, he also testified that the protest lasted "hours and hours," ROA. 1651:18–20, with "several different . . . phases" during which protesters "were enticing the police" by "step[ping] out into the road" and then "jump[ing] back into the parking lot" when officers "c[a]me around to push them back." ROA. 1697:3–13. This was not, in his telling, a linear event leading to the crescendo of a single unified decision to march out onto the highway; it was an hours-long demonstration during which different people stepped into the road at different times. And Ford has offered nothing to connect Mckesson to controlling each, or even most, of those movements.

Ford also argues that Mckesson was "leading chants" and that he ordered "subordinates" to call his lawyer after he was arrested. Br. at 24, 30. Much like the re-tweeting discussed above, this is plainly insufficient to show that one is a "protest leader." If joining, or even leading, chants could be proof of the kind of leading or organizing sufficient to give rise to a duty, the distinction between a protest leader and a protest participant would collapse. Meanwhile "directing subordinates" to call one's lawyer as police are effecting an arrest could more readily be described as "asking friends to reach out for support." Making sure that a lawyer is aware and prepared to take action in these circumstances is not something only protest leaders do.

Ford himself does not appear to argue that such testimony alone would suffice to create an issue of material fact, instead arguing that "[a]gainst the backdrop of Mckesson leading protest after protest all over the country that turned violent or resulted in injuries to police working the protests, a jury could well believe Mr. Ford's testimony that it happened, yet, [*sic*] again." Br. at 33. Not so. As an initial matter, much of the "evidence" Ford highlights on this point is not admissible and could not be admissible at trial. Evidence of prior acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," Fed. R. Evid. 404(b)(1), and even if it were, Ford has failed to demonstrate how any of it shows Mckesson's role specifically at the

Baton Rouge protest. In addition, as discussed above, the articles and online posts Ford offers constitute inadmissible hearsay.

Even if these exhibits were somehow admissible, they fail to show that Mckesson even attended, much less led, other protests where violence occurred. The majority of the articles Ford submits discuss violence or road obstruction at protests in St. Paul, ROA. 1810–1811, *see also* ROA. 1818, 1821–24, New York, Chicago, Atlanta, and Miami, ROA. 1897, 1899–1900—all of which took place between July 8 and 10, 2016. But Mckesson was undeniably in Baton Rouge at that time, and Ford's theory turns on his direct leadership and organization of *that* protest.[10]

Indeed, in the articles and transcripts Ford has offered, Mckesson repeatedly states "there should be peaceful protests" and "What I agree with is that I advocate

---

[10] To the extent that Ford seeks to associate Mckesson with the Dallas sniper, he is showing only his own bias. *No* article or other record evidence supports any such connection. To the contrary, several of Ford's exhibits note that the Dallas murder of police officers was the act of one man alone, and that protesters associated with the BLM movement expressly condemned it, "calling the attack on law enforcement a tragedy not just for those affected but for the nation." ROA. 1817, 1904.

Similarly, though Ford mischaracterizes two of his exhibits as "articles about FBI classifying Mckesson as a 'treat actor' [*sic*]," those exhibits show that the purported labeling was done by a private company—and was done in error. A recent article submitted by Ford notes that the private company admittedly *mis*identified Mckesson as "a 'high severity' physical threat, despite including no evidence that [he was] suspected of criminal activity" and includes a quote from the company's spokesperson explaining that the "incident" led the company to "invest[ ] heavily in fine-tuning our collections, analysis, and labeling of alerts . . . to ensure we are only alerting customers to legitimate threats and are labeling those threats appropriately." ROA. 1905–06.

people to peacefully protest." ROA. 1776. Articles that describe Mckesson's actual work note his focus on tangible policy changes, ROA. 1794, his hopes that people in the BLM movement will "start getting involved in hyper-local politics," becoming "city council members, mayors, school board members," ROA. 1917, and his run for mayor of Baltimore, ROA. 1934.

4. There is no evidence that Mckesson deliberately led the assembled protest into the street.

Nor has Ford established his third significant allegation. He claims, without citation, that Mckesson testified that "he led a group down Airline attempting to gain entry to the I-12 [Highway] overpass." Br. at 23. Mckesson said no such thing. To the contrary, he testified that he "followed the people leading who were marching towards I-12." ROA. 1740, 85:12–13. Those people "knew where they were going and I certainly did not know anything about that area well." ROA. 1740, 85:15–18.

In addition, during his deposition, Mckesson was asked "So if there's a large group behind you, your testimony is that you were not leading them, but they were just following behind you?" He responded, "Absolutely. Correct. *I was not leading them*." ROA. 1738, 80:20–23 (emphasis added). When people march together along one route, some portion of them, will, by definition, be followed by others. That people are seen "behind" someone at a protest march shows nothing more than the individual was not at the very back of the gathering.

Ford also relies on a video Mckesson recorded shortly before and during his arrest, arguing that it shows that he was at the front of the march when it was turned back by police and therefore must have been leading it. Br. at 23–24. Notwithstanding the Court's general obligation to view the facts in the light most favorable to the nonmoving party, where there is video in the record that captures an "event[ ] in question" and there is no "contention that what it depicts differs from what actually happened," the Court may not accept the nonmoving party's "visible fiction"; it must instead "view[ ] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378–81 (2007). The trial court properly did so and correctly found that the video shows Mckesson to have been in the middle—not the end, after having turned around, or front—of a group.[11]

Moreover, throughout the five minutes of the video that take place before Mckesson's arrest, he does not say anything resembling an order or direct anyone's movements. And in the minutes that follow his arrest, though his friends appear visibly distressed, the march does not halt or erupt into chaos and the protest does

---

[11] In the first minute, as the camera pans from what is in front of Mckesson to what is behind him, the people in front of him change, *compare* 0:00-0:25 (woman in black shirt and shorts), with 0:42-0:47 (woman in blue cap), which would only be possible if people walking behind him passed him. At 1:19, a person is clearly shown passing Mckesson from behind, on his right. At 3:35, when Mckesson pauses and turns fully to face behind him, it becomes clear that there is a group of people behind him. The same is true, perhaps even more visibly, at 4:14-58. Notice of Conventionally Filed Document, *Doe v. Mckesson*, No. 16-00742 (M.D. La. March 4, 2024), ECF 119, Ex. X. (video submitted via flashdrive).

not end—further undercutting the contention that he personally controlled or directed the protest's movements.[12]

5. Ford's remaining evidence does not support his allegations.

Finally, without making any effort to connect these arguments to the three "significant" markers of leadership identified by this Court, Ford contends that Mckesson must have led the protest because he "was the one in the newspaper the next day speaking out for the protestors and he was the lead plaintiff in the class action filed on behalf of the protestors." Br. at 34.

Ford's reliance on the civil rights lawsuit is puzzling. In that suit, Mckesson was one of four named plaintiffs who sought to represent "a class of all persons who were arrested on approximately July 6, 7, 8, 9, 10 and 11, 2016, and charged with only a violation of La. R.S. 14:97 [misdemeanor street obstruction] while exercising their civil rights, were imprisoned and were released on or before July 12, 2016." Complaint ¶4, *Mckesson v. City of Baton Rouge*, No. 16-520 (M.D. La. Aug. 4, 2016), ECF 1. Far from attesting to a unique leadership role for Mckesson, this complaint represents that he—and the three other named plaintiffs—were arrested

---

[12] Similarly, if they could be authenticated and admissible at trial, several of the photographs Ford submits, purportedly taken at the Baton Rouge protest, also undercut Ford's claim that Mckesson led and controlled the protest's movements. *See, e.g.*, ROA. 1762, 1765, 1766, 1767, 1768, 1770, 1771 (depicting many protesters marching, standing at the police line, holding signs, chanting, and locking arms without any sign of Mckesson).

and had an experience that was "typical" of the broader class. *See* Fed. R. Civ. P. 23(a)(3). Being arrested at a protest does not make one its leader.[13]

Finally, that Mckesson spoke to a reporter about his experience at the protest may show that he is a well-known advocate for civil rights, whose arrest would be newsworthy, but nothing more. And, even if they were admissible, the quotations in that article ostensibly report Mckesson's reflections on police brutality and his arrest experience. If that were enough to make one a leader, any one of the many people arrested at the protest could be subject to this suit.

###### C.     Without proof that Mckesson organized or led the protest, Ford cannot establish that he bore a duty, much less that he breached it.

Because Ford has failed to show that Mckesson organized or led the protest, he has failed to show that Mckesson bore any protest-leader duty.

Equally, he has failed to show that Mckesson breached any such duty.

First, without showing that Mckesson organized the protest at all, Ford cannot possibly show that he organized it "to begin in front of the police station, obstructing access to the building." *Doe*, 71 F.4th at 292. Moreover, even if Ford had somehow

---

[13] Indeed, when Ford's former employer settled the case, it conceded that Mckesson was a proper representative, and gave him the same relief (expungement of the arrest record and monetary compensation) granted to the scores of other similarly situated class members. Joint Motion for Approval of Settlement Agreement, *Mckesson*, No. 16-520, ECF 52, Ex. A at 3–4.

established that Mckesson chose the location of the protest, there is no evidence that the protest in fact obstructed access to the police station. To the contrary, Mckesson testified that no one was on "the actual property of the police department because it was gated." ROA. 1738, 79:25–80:10; ROA. 1741, 89:17–23. And Ford testified that the Circle K parking lot—across the street from the police department, *see* ROA. 1761, is "where everybody gathered up in the beginning." ROA. 1648:16–21. He also testified that he himself was moving in the "police lot," showing that access to it was not obstructed. ROA. 1649:5–12.

Second, without sufficient proof that Mckesson "personally assumed control of the protest's movements," Ford cannot show that he breached any duty by "fail[ing] to . . . prevent or dissuade his fellow demonstrators once they began to loot a grocery store and throw items at the assembled police." *Doe*, 71 F.4th at 292.

Even if Ford had somehow shown that Mckesson controlled the protesters, the idea that demonstrators were "loot[ing] a grocery store" defies commonsense, given that officers—who had been instructed to arrest anyone who "committed a crime in Baton Rouge" during the assembly, ROA. 1694:9–13—simply "watched them" and did not initiate any arrests, ROA. 1686:2–4. Ford's attempt now to argue that the evidence shows that Mckesson himself threw a water bottle is, as the District Court correctly pointed out, also meritless. The entire basis for that assertion is Ford's recollection that he at one point saw Mckesson holding an object and that

34

Mckesson was no longer holding it when arrested. And the inference is particularly implausible given that officers never arrested him for throwing things or inciting anyone else's violence. *See* ROA. 1655:22–1656, 44:3.[14]

Finally, without credible or minimally sufficient evidence that Mckesson "led the assembled protest," Ford cannot show that he breached any duty by walking out in the street. *Doe*, 71 F.4th at 292. This Court has already explained that "the precise tortious activity for which Doe seeks to hold Mckesson liable" is not "highway obstruction as a tort *per se*," but rather "Mr. Mckesson's [alleged] direction of the protesters to obstruct Interstate 12." *Id.* at 298. Denying summary judgment merely because Mckesson walked into the street would devolve this case into precisely what this Court already held it was not.[15]

---

[14] Ford also testified that several residents who attended the protest told him "that they asked DeRay to go home personally and that he refused to go home[.]" ROA. 1328, 78:20–1329, 79:3. This, too, is hearsay and Ford did not bear his burden to show it would be admissible at trial.

[15] It is also worth noting that merely walking in the street, without obstructing traffic, is not a violation of Louisiana law—nor, if it were, would the law be a reasonable time, place, and manner restriction. *See Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("time out of mind, [streets] have been used for . . .assembly, communicating thoughts between citizens, and discussing public questions"); *Frisby v. Schultz*, 487 U.S. 474, 480 (1988) ("[P]ublic streets a[re] the archetype of a traditional public forum."); *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (It is "no accident that public streets . . . have developed as venues for the exchange of ideas."). Moreover, Mckesson's arrest for misdemeanor road obstruction was affirmatively expunged, ROA. 1840, *see also* ROA. 1896 (article that, if admissible, reports that Baton Rouge Parish District Attorney stated "that his office reviewed initial police reports on 185 arrests between July 8-11 and determined it will not prosecute roughly 100 of those cases," including the "misdemeanor charge[] of obstruction" against

**D. The record fails to show that Mckesson was the cause-in-fact of Ford's injuries.**

"It is not enough that [Ford] show that Mckesson breached his duty of care . . . [He] must prove that he would not have been injured *but for* the manner in which Mckesson organized and led the protest." *Doe*, 71 F.4th at 292 (emphasis added). As this Court has explained, "[o]nly seldomly will a plaintiff be able to prove that the specific actions taken by [a leader] caused the alleged injury" because, "[i]n most cases, the altercation would have occurred regardless of how the protest leader . . . acted." *Id.* at 291 n.8. Ford has failed to establish that this is one of the unusual cases.

Though Ford submitted that numerous unidentified individuals were agitating the crowd—testifying that he and the rest of his team "were arresting agitators" and arrested "a lot of people" that day and night, ROA. 1662:22–24, ROA. 1664:21–1665:1—he has offered no explanation for how Mckesson, rather than any one of these other individuals, was the cause of his injuries—or the means by which he would show he would have not been hit by a projectile had Mckesson not been present.

Ford argues only that he "would not have been making arrests 'but for' the illegal conduct orchestrated by Mckesson." Br. at 28; *see also* ROA. 1245 (arguing

---

Mckesson). Thus, even if the evidence showed that Mckesson organized the protest *and* simply led others onto the street, that is not enough to show any breach of protest-leader duty.

below that "[b]ut for the pattern of BLM organizing its protests on city streets without a permit in violation of local laws with the intention of engaging police, the injuries in this case would not have occurred"). But Ford's testimony also contradicts this theory of causation: He testified that, over the course of several hours, during "different parts of the day and night they . . . started throwing things," though "[i]t didn't happen the whole time of the protest." ROA. 1699:16–20. Throughout, Ford testified, he heard objects bouncing off of officers' shields. ROA. 1699:2–20. In light of this, Ford's theory that Mckesson's walking into the street or inducing others to do so was what caused the projectile to be thrown at Ford falls apart.[16]

*    *    *

In sum, Ford has failed to establish any of the elements this Court said were necessary to hold Mckesson liable for his injuries under Louisiana tort law and the

---

[16] If they could be authenticated and admissible at trial, several of the photographs purportedly taken at the Baton Rouge protest would similarly cast significant doubt on this theory. *See, e.g.,* ROA. 1769 (depicting arrest in daylight, before Ford claims Mckesson led others into the street). The same is true for Captain Wiedeman's declaration, in which he states that "*[o]n several occasions*, the protesters attempted to block the interstate," ROA. 1785 (emphasis added), without ever mentioning Mckesson, and contrary to Ford's theory that the lawlessness was tied to Mckesson purportedly leading those who'd been "following" him into the street.

Moreover, some of the (inadmissible) articles on which Ford relies detail road obstruction and people throwing objects at police at protests that Mckesson indisputably did not even attend. *See supra* Section I.B.3. He had nothing to do with those events, and yet not dissimilar violence occurred in interactions between police officers and protesters, further undercutting Ford's contention that Mckesson's presence was an indispensable link in the causation chain in Baton Rouge.

First Amendment, and the District Court's judgment can and should be affirmed on that basis alone.

## II. The First Amendment requires judgment for Mckesson as a matter of law.

After this Court issued its 2023 opinion, the Supreme Court decided *Counterman v. Colorado*, in which it recognized that, in the context of protests "against the government and prevailing social order"—precisely the context at issue here—the First Amendment will not countenance a person being punished on a showing of mere negligence. 600 U.S. at 81. The Court recounted that it was just "[s]uch protests" that had given "rise to all the cases in which the Court demanded a showing of intent." *Id.*

First-Amendment-protected activity that is "a hair's-breadth away from political 'advocacy'—and particularly from strong protests" "demand[s]" the most protection. *Id.* In particular, such activity may be punished only based on "a showing of intent" that the protester meant for the harm to occur. *Id.* That "strong intent requirement," the Court explained, "ensure[s] that efforts" to hold protesters liable do "not bleed over" to silencing the kind of "dissenting political speech" and activity "at the First Amendment's core." *Id.*

Because rules that punish First-Amendment-protected activity "have the potential to chill, or deter, speech," "a culpable mental state [requirement]" acts as "an important tool" to "provide[ ] 'breathing room' for more valuable speech." *Id.*

38

at 75 (citation omitted)). In contrast, the absence of a mental state requirement "may lead [a speaker] to swallow words," disclaim associations, and avoid protests, thus "discourag[ing] the 'uninhibited, robust, and wide-open debate that the First Amendment is intended to protect.'" *Id.* at 78 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)).

The facts in *Counterman* itself concerned private threats of violence the defendant communicated directly to a local singer and musician. *Id.* at 70. None of the speech at issue was political or on a matter of public concern; there was no "political advocacy" "present" in the case. *Id.* at 81. Even under those circumstances—where the risks of chilling were negligible—the Court held that liability based on mere negligence was constitutionally impermissible, instead requiring a showing of recklessness. *Id.* at 77–78, 80.

These clear pronouncements preclude Ford's sole remaining claim in this case. If a person who organizes a protest to challenge the status quo could be liable in a civil suit not because he *intended* that a violent act occur, but instead because he showed insufficient care in protecting those present, negligence lawsuits would become a dangerous tool for those seeking to quash dissent.

Indeed, Ford does not seriously argue that a judgment based on negligence can survive under this controlling test. Rather, he invites the Court to ignore *Counterman* because (1) the Supreme Court could have granted review at an earlier

stage of this case but did not, and (2) the only reference to *Counterman* in the Supreme Court's denial of Mckesson's recent petition for certiorari came in the statement of a single Justice. These arguments are unavailing. The Supreme Court has repeatedly admonished that its denial of certiorari in a case is not to be taken as an expression of approval of the appellate decision, and denials are the norm when certiorari is sought in an interlocutory posture, especially where, as here, a complaint has not been answered and no discovery has been obtained. It is therefore noteworthy that *any* Justice sought to comment further on the denial. Moreover, regardless of whether one Justice flagged *Counterman*, or no Justice had at all, this Court has an obligation to follow and apply the Supreme Court's governing caselaw. [17] It is clear that *Counterman* requires dismissal.

---

[17] Even if, per Ford's argument, this Court's assessment of the sufficiency of allegations could somehow establish "law of the case," *but see supra* Section I.B.1, Ford's contention that the District Court ignored the law of the case here is incorrect because the Supreme Court issued a controlling decision in the meantime. *See Davis v. United States*, 417 U.S. 333, 342 (1974) (court erred in adhering to law of the case doctrine despite intervening Supreme Court precedent).

## CONCLUSION

For the foregoing reasons, Appellee DeRay Mckesson respectfully asks the Court to affirm the District Court's judgment.

Dated: December 27, 2024

/s/ *Vera Eidelman*
Vera Eidelman
Ben Wizner
Brian Hauss
Emerson Sykes
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org

David T. Goldberg
DONAHUE & GOLDBERG LLP
240 Kent Avenue
Brooklyn, NY 11249

William P. Gibbens
Ian Atkinson
SCHONEKAS, EVANS, MCGOEY &
    MCEACHIN, LLC
909 Poydras Street, Ste 1600
New Orleans, LA 70112

David D. Cole
600 New Jersey Ave. NW
Washington, DC 20001

Nora Ahmed
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION OF LOUISIANA
P.O. Box 56157
New Orleans, LA 70156
*Attorneys for DeRay Mckesson*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P.32(f), this document contains 10811 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2016 in type style Times New Roman and font size 14.

Respectfully Submitted,

/s/ *Vera Eidelman*
Vera Eidelman