# United States Court of Appeals
# for the Fifth Circuit

———————

No. 24-30494

———————

United States Court of Appeals
Fifth Circuit

**FILED**

March 19, 2026

Lyle W. Cayce
Clerk

John Ford, *former Officer John Doe Police Officer*,

*Plaintiff—Appellant*,

*versus*

DeRay McKesson; Black Lives Matter; Black Lives Matter Network, Incorporated,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:16-CV-742

———————————————————

Before King, Jones, and Oldham, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

After two decisions from this court, a Supreme Court decision, certified questions addressed by the Louisiana Supreme Court, and a subsequent denial of certiorari by the Supreme Court, Officer John Ford has yet to present his case to a jury. Eight years of pretrial litigation are enough. It is time for Officer Ford to have a jury assess his claim that DeRay Mckesson's negligence in leading a violent protest caused him to suffer injuries at the hands of rioters. The district court's grant of summary

judgment for Mckesson is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

I.

At this advanced stage of the litigation, "the background facts [remain] well known." *Doe v. Mckesson*, 71 F.4th 278, 282–83 (5th Cir. 2023). Mckesson is a leader in the "Black Lives Matter" movement, who has attended "hundreds of protests" and received financial support for his efforts. During 2016, he prominently participated in protests in Baltimore, McKinney, Ferguson, and Earth City. Some of these protests devolved into riots in which rioters injured police officers, looted businesses, destroyed property, and damaged communities. *Id.* at 283. Due to his personal experience attending and watching many protests, he admitted to knowing that protestors blocking public highways could lead to violent clashes with police. Mckesson not only participated in protests that turned violent—he also refused to condemn political violence in an interview on national television.

The day before July 9, 2016, Mckesson travelled to Baton Rouge and met with others who were planning a Black Lives Matter protest. On the appointed day, Mckesson led protestors in congregating in front of a Baton Rouge Police Department station. The initially peaceful protest became violent, as rioters looted a store, stole water bottles, and threw them at police officers. *Id.* Mckesson was present as protestors looted a Circle K gas station, and he was seen carrying a stolen a water bottle outside the store. While the looting was happening, officers observed Mckesson leading protestors and witnessed "people moving with him." Given Mckesson's television interview refusing to condemn the use of violence, it is unsurprising that he did nothing to discourage protestors from assaulting police officers, looting a store, and engaging in other lawless acts.

Later, Officer Ford witnessed Mckesson "leading the crowd" and "talking to a lot of people." Later, he was seen "getting [protestors] ready to walk into the highway." Officer Ford and "other police officers" then witnessed Mckesson "giving orders" to protestors "to go out into that road and block traffic." Mckesson was then "in the front" of the crowd that followed him "out into the highway."

While obstructing the road, the protestors continued to throw water bottles at police. As their water bottle supply dwindled, one rioter threw either a piece of concrete or a rock that hit Officer Ford in the face. The resulting blow knocked Officer Ford to the ground and caused devastating harm, including the loss of teeth, a jaw injury, a concussion, and post-traumatic stress disorder. The injuries Officer Ford suffered to his teeth were so extensive that he was forced to spend 18 hours undergoing procedures in a dental chair. Officer Ford suffers ongoing problems as result of his injury. Years later, his vision is still clouded with "black marks" and "squiggly clear lines." Because of his injuries, Officer Ford quit being a law enforcement officer and was forced to begin a new career in construction.

Officer Ford filed a complaint in federal district court against Mckesson and Black Lives Matter. He asserted tort claims based on theories of negligence, *respondeat superior*, and civil conspiracy. Officer Ford sought leave to amend and join Black Lives Matter Network, Inc. and #BlackLivesMatter as defendants. The district court dismissed Officer Ford's claims with prejudice and denied leave to amend. *Doe v. Mckesson*, 272 F. Supp. 3d 841, 850 (M.D. La. 2017).

On appeal, this court affirmed the dismissal of Black Lives Matter. *Doe v. Mckesson*, 945 F.3d 818, 834 (5th Cir. 2019). Additionally, this court affirmed the district court's dismissal of the *respondeat superior* and civil conspiracy claims against Mckesson. *Id*. at 834–35. However, this court reversed the dismissal of Officer Ford's negligence claim. This court held

that Louisiana state law recognized a theory of negligence that would allow a jury to find that Mckesson had a duty to exercise reasonable care in organizing a Black Lives Matter protest. *Id.* at 826–28. We concluded that a jury could find that he breached this duty by leading the protest in a manner in which it was reasonably foreseeable that the protest would lead to a violent confrontation with police. *Id.* This court further rejected Mckesson's defense that the First Amendment protected him from liability for his actions while leading the protest. *Id.* at 832. Mckesson's request for a rehearing *en banc* was denied. *Doe v. Mckesson*, 947 F.3d 874 (5th Cir. 2020).

Mckesson petitioned the Supreme Court for *certiorari* on his First Amendment defense. The Court granted *certiorari*, but it did not reach the merits of the First Amendment question. The Court found that this court's interpretation of Louisiana state law was "too uncertain a premise on which to address" the First Amendment issue. *Mckesson v. Doe*, 592 U.S. 1, 4, 141 S. Ct. 48, 50 (2020). Therefore, the Supreme Court vacated this court's panel opinion and remanded for certification to the Supreme Court of Louisiana the question whether Louisiana recognizes Officer Ford's negligence claim.

On remand, this court certified two questions to the Supreme Court of Louisiana:

> 1) Whether Louisiana law recognizes a duty, under the facts alleged in the complaint, or otherwise, not to negligently precipitate the crime of a third party?
>
> 2) Assuming Mckesson could otherwise be held liable for a breach of duty owed to Officer Doe, whether Louisiana's Professional Rescuer's Doctrine bars recovery under the facts alleged in the complaint?

*Doe v. Mckesson*, 2 F.4th 502, 504 (5th Cir. 2021). The Supreme Court of Louisiana "answered the first question 'yes,' and the second question 'no.'" *Doe v. Mckesson*, 71 F.4th 278, 285 (5th Cir. 2023) (citing *Doe v. McKesson*, 339 So. 3d 524, 530–36 (La. 2022)).

The case returned to this court. Because the Supreme Court had vacated this court's original judgment, it became necessary to reconsider each of the original issues on appeal. The panel reaffirmed its previous conclusions, remanded the case to the district court for trial, and again rejected Mckesson's First Amendment defense. *Id.* at 289.

The district court, however, granted summary judgment for Mckesson on the negligence claim. First, the district court found that there was no evidence that Mckesson led the protestors, and as a result, he owed Officer Ford no duty of care. *Ford v. Mckesson*, 739 F. Supp. 3d 344, 351 (M.D. La. 2024). Second, the district court found that Mckesson's conduct was not a cause-in-fact of Officer Ford's injuries. *Id.* at 351–52. Finally, the district court found that Mckesson's participation in the protest was protected by the First Amendment and the intervening Supreme Court case of *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106 (2023). 739 F. Supp. 3d at 352–53.

Officer Ford has appealed.

## II.

"This court reviews a district court's grant of summary judgment . . . de novo." *Willis v. Barry Graham Oil Serv., L.L.C.*, 122 F.4th 149, 153 (5th Cir. 2024). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if a reasonable jury "could differ as to the import of the evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250, 106 S. Ct. 2505, 2511 (1986); *see also Dupree v. Younger*, 598 U.S. 729, 731–32, 143 S. Ct. 1382, 1387 (2023) (explaining that the summary judgment and judgment as a matter of law standards are effectively the same). When assessing the record, this court "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment." *Smith v. Reg'l Transit Auth.* 827 F.3d 412, 417 (5th Cir. 2016) (quoting *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995)). It must be borne in mind that "at the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.

### III.

The first issue on appeal is whether there is a genuine dispute as to any material facts that constitute the elements of Officer Ford's negligence claim. The second issue is whether the First Amendment immunizes Mckesson from facing trial for his negligence.

### A.

Louisiana Civil Code article 2315 provides, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." In applying this code, Louisiana adopts a "duty-risk" theory of negligence. *Doe*, 339 So. 3d at 531. To prevail under a negligence theory, Officer Ford must prove five elements: "(1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached." *Doe*, 71 F.4th at 288 (quoting *Doe*, 945 F.3d at 826).

i.

The facts establishing Officer Ford's injury are undisputed. He was hit in the head with a piece of concrete or similar substance. This blow caused him to lose teeth, injure his jaw, and suffer a concussion. In the aftermath of the concussion, he has suffered lasting vision damage. As a result of the injuries and post-traumatic stress disorder caused by the incident, Officer Ford had to leave the Baton Rouge Police Department and begin a new career.

ii.

Whether a duty of care exists is purely a question of state law. *Bursztajn v. United States*, 367 F.3d 485, 489 (5th Cir. 2004). The Supreme Court of Louisiana unambiguously answered that question and held that Mckesson owed a duty of care to Officer Ford. *Doe*, 339 So. 3d at 530–33. In its decision, the Supreme Court of Louisiana held that a duty of care exists in the facts presented in this case, and it affirmed this court's holding that Louisiana law recognizes "a duty not to negligently precipitate the crime of a third party." *Id.* at 532 (quoting *Doe*, 945 F.3d at 827).

This duty attaches if a fact-finder determines that Mckesson negligently led the protest. Here, the record contains ample evidence to allow such a finding. Mckesson's own testimony is that he was "part of" a group of "incredible leaders who were planning things . . . associated . . . with the protest." Further, Mckesson admitted that he came to Baton Rouge because his "team" was in contact with leaders in "the organizing community" who had "asked [his team] to come." Additionally, he "amplified" posts about the protest to his over quarter million Twitter followers so that they would know "that there would be protests in Baton Rouge." Once the protest—that he helped plan—was underway, Officer Ford observed Mckesson as the crowd followed him around; as he directed

them with his body language and got protestors ready to walk on the highway; and as they followed him and members of the New Black Panther Party out onto the highway. Mckesson's leadership was recognized not only by police, but also by other protestors who submitted to his authority and "were following him all over the area." Indeed, a video that Mckesson filmed on his cell phone would allow a reasonable fact-finder to conclude that the video of Mckesson's arrest demonstrates that he was leading the group toward I-12 for the purpose of blocking the interstate highway. After police officers cut off the protestors and thwarted them from carrying out the criminal act of interrupting traffic on I-12, the group turned around and started marching away from I-12. As the group was turned around by police, Mckesson is one of the people closest to the police officers who intervened to cut off the march. A reasonable jury could infer that Mckesson's position at the front of the protest as it was cut off by police evidences his leadership over the unlawful movements of the protestors.[1]

Mckesson's brief admits his leadership role in the protest. At minimum, Mckesson admits that "the evidence shows that [he] is a well-known leader in a social movement, that he attended the July 9 protest, that he re-tweeted someone else's announcement of the Baton Rouge protest's time and location, and that some group of people followed him at various moments of the day." Further, Mckesson's brief admits that there is "no

-------------------------

[1] The dissent argues that the video does not show the protestors turning around after police cut them off. However, the record as a whole supports that this is exactly what happened. When asked if he was "marching towards I-12," Mckesson said "yes." Mckesson also admitted that police intervened to turn the protestors around and that he only started filming the video after he complied with police orders to turn around. The video itself corroborates the fact that police turned the protestors around, with Mckesson informing viewers of the video, "We're walking back." The video also corroborates the fact that Mckesson was near the back of the crowd after the protest had been turned around by police, with Mckesson stating that the police "are like literally right behind us."

question" that "a protest leader may be held liable for" this tort. As Mckesson admits, to hold him liable it is not required for a jury to find that Mckesson was *the* only leader of the protest. Rather, it is sufficient for a jury to find that Mckesson was *a* leader of the protest.

So far, the evidence would permit a jury to find that Mckesson was involved in planning the protest and leading the protest on the day it occurred. But his leadership did not end there. After the protest was over, Mckesson sued the City of Baton Rouge in a class action lawsuit. His own court filings admit that he was a leader of the protest and argued that he was an adequate representative of the class of protestors who were arrested by police due to the "leadership" he exercised over them. Memorandum in Support of Motion for Final Approval of Class Action Settlement at 15, *McKesson v. City of Baton Rouge*, Civ. No. 16-520-JWD-RLB, 2017 WL 11675692 (M.D. La. Nov. 16, 2017). By claiming to be a leader of the protest, Mckesson ultimately received a settlement from the City of Baton Rouge. A jury could choose to take Mckeson at his word and find that he led the protest.[2]

That Mckesson assumed a leadership role in the Baton Rouge protest is not surprising, given that, as he admits, he is routinely identified as one of the "leaders in the Black Lives Matter Pride Movement." Furthermore, during an interview on national television, he was identified as a prominent "community organizer." His leadership was even recognized by the highest

---

[2] The dissent unsuccessfully argues that Mckesson's role as a leader in a class action regarding the protest "does not refer to his leadership of the *protest*." (emphasis in original). This argument fails on its own terms, as Mckesson's own court filing indicates that his "leadership" is directly related to the "broad spectrum of persons who were involved in the protests." Memorandum in Support of Motion for Final Approval of Class Action Settlement at 15, *McKesson v. City of Baton Rouge*, Civ. No. 16-520-JWD-RLB, 2017 WL 11675692 (M.D. La. Nov. 16, 2017).

levels of the federal government, and he met with President Obama and Attorney General Lynch to discuss Black Lives Matter. Mckesson argues the evidence of his leadership in Black Lives Matter is inadmissible. Although prior act evidence "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," it is "admissible for . . . proving . . . motive, . . . intent, preparation, plan[ning], knowledge, . . . absence of mistake, or lack of accident." FED. R. EVID. 404(b). Officer Ford's evidence could be admitted under these exceptions.

There is ample admissible evidence to create a genuine, material fact dispute about whether Mckesson was a leader in the protest. The district court erred in discounting the evidence as "self-serving, uncorroborated, and inconsistent." *Ford*, 739 F. Supp. 3d at 351. This holding is erroneous for at least two reasons. First, the mere fact that evidence is "self-serving" does not permit a judge to grant summary judgment. To the contrary, "self-serving affidavits and depositions may create fact issues even if not supported by the rest of the record." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (internal quotation marks omitted). Further, assessing "[h]ow much weight to credit self-interested evidence is a question of credibility, which judges may not evaluate at the summary judgment stage." *Id.* at 161. All that is required is that "self-serving evidence . . . comport with the standard requirements of Federal Rule of Civil Procedure 56" and "'be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *Id.* (quoting FED. R. CIV. P. 56(c)(4)). Here, Officer Ford testified from personal knowledge based on what he saw as an eyewitness. His testimony plainly complies with FED. R. CIV. P. 56(c)(4).

Second, the district court erred because the evidence in the record corroborates Officer Ford's testimony. As recounted above, the evidence

demonstrates that Mckesson helped plan the protest, was a leader in many protests that have turned violent, amplified messages about the protest on social media, and gave orders to the crowd during the protest. Additionally, a video of Mckesson's position near the police as they cut off the protestors from accessing the interstate substantiates the other evidence. This evidence all tends to support that Mckesson was a leader of the protest, if the jury so determines.

### iii.

A reasonable jury could also find that Mckesson breached his duty of care by "organizing the protest in such a manner where it was reasonably foreseeable that a violent confrontation with the police would result." *Doe*, 71 F.4th at 284. As this court held, and the Supreme Court of Louisiana confirmed, "It was patently foreseeable that the Baton Rouge police would be required to respond to the demonstration by clearing the highway and, when necessary, making arrests." *Doe*, 339 So. 3d at 531 (quoting *Doe*, 945 F.3d at 827). A jury could find that Mckesson was undeterred by the foreseeable risk of violence and engaged in "intentional lawlessness" by leading "the demonstrators onto a busy highway . . . to provoke a confrontation between police and the mass of demonstrators." *Id.* Mckesson "direct[ed]" protestors "to go out into that road and block traffic." Such an action is patently illegal under Louisiana law. LA. STAT. ANN. § 14:97. Additionally, Mckesson was in charge while protestors looted a store and threw water bottles at police. A jury could find that by engaging in this conduct, he put the lives of "officers, bystanders, and demonstrators" at risk and "failed to exercise reasonable care in conducting his demonstration." *Doe*, 339 So. 3d at 531 (quoting *Doe*, 945 F.3d at 827).

The record contains ample evidence that Mckesson led the protest in a way that violated his duty of care. For instance, Mckesson had previously

"participated in other Black Lives Matter protests in which demonstrators blocked public highways, and in which police officers were injured." *Doe*, 71 F.4th at 288. Mckesson supported these violent protests, and he refused to condemn the use of violence in a televised interview on CNN. Consequently, whether Mckesson breached his duty to Officer Ford and others raises a triable jury question.

iv.

Next, a reasonable jury could determine that Mckesson's conduct was the cause-in-fact of Officer Ford's injuries. A jury must determine if "but for the defendant's conduct, the incident probably would not have occurred." *Doe*, 339 So.3d at 532. (approving of this court's quoting of *Roberts v. Benoit*, 605 So.2d 1032, 1052 (La. 1992) in *Doe*, 945 F.3d at 828). So long as "the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met." *Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289, 292 (La. 1993).

This court and Louisiana's Supreme Court have both already held that the facts of this case are sufficient for a jury to find that Mckesson's actions were the cause-in-fact of Officer Ford's injuries. According to the state supreme court, the evidence could allow a jury to find that "by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the 'but for' causes of Officer Doe's injuries." 339 So. 3d at 532 (quoting *Doe*, 945 F.3d at 828). Further, the Louisiana Supreme Court recognized, "It is an uncontroversial proposition of tort law that intentionally breaking, and encouraging others to break, the law is relevant to the reasonableness of one's actions." *Id.* (quoting *Doe*, 945 F.3d at 828). Officer Ford testified that he and other officers observed Mckesson ordering other protestors to go out into the roadway and leading them in their incursions into lanes of traffic.

Additionally, Mckesson's negligence in organizing the protest would permit the jury to find that he is the cause-in-fact of Officer Ford's injuries. Indeed, the fact that lawlessness, looting, and assaulting police officers occurred under Mckesson's leadership "support[s] the assertion that he organized and directed the protest in such a manner as to create an unreasonable risk that one protestor would assault or batter [Officer Ford]." *Doe*, 71 F.4th at 289.

The dissent argues that holding that a jury could find that Mckesson is the cause-in-fact of Officer Ford's injuries could open the door to protest leaders being held liable for the actions of people participating in a counter-protest. This court has no occasion to reach that question in this case, however, the dissent's concern seems unfounded. To be liable, a protest leader must have "organized and directed" the protestor's actions. *Id.* Further, the Louisiana Supreme Court has held that liability for protest leaders attaches only when they "encourage[e] others to break . . . the law." 339 So. 3d at 532 (quoting *Doe*, 945 F.3d at 828). It is highly unlikely that a protest leader's actions would make them accountable for the torts committed by counter-protestors.

v.

Finally, Officer Ford satisfies the scope of duty requirement. Under Louisiana law, determining "scope of the duty involves a purely legal question." *Malta v. Herbert S. Hiller Corp.*, 333 So. 3d 384, 399 (La. 2021). This court previously held that "a central purpose of imposing a duty in these circumstance[s] is to protect those who are injured as a result of a negligently organized and led protest. As such, the risk of harm to [Officer Ford] is plainly within the scope of protection afforded by the duty owed by Mckesson here." *Doe*, 71 F.4th at 289.

Under Louisiana law, the scope of duty inquiry asks whether the duty imposed is intended to protect "this plaintiff from this type of harm arising in this manner." *Faucheaux*, 615 So. 2d at 294. Officer Ford satisfies this test. The duty to exercise due care in leading a protest protects the physical safety of police officers who must be on hand to prevent potential outbursts of violence. Officer Ford suffered the exact type of harm, starting with his being hit in the head, that the duty aims to prevent.

\*

It is not certain whether Officer Ford will prevail in front of a jury. Indeed, "reasonable minds could differ as to the import of the evidence," but that is precisely why this case must now be brought before a jury. *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

## B.

The district court additionally erred in departing from this court's earlier holding that "imposing negligence liability on Mckesson does not offend the First Amendment." *Doe*, 71 F.4th at 291. Under the Fifth Circuit's rule of orderliness, only the en banc Fifth Circuit or the Supreme Court may overrule Fifth Circuit precedent. *Texas v. United States*, 126 F.4th 392, 406 (5th Cir. 2025). The district court erred in assuming that *Counterman*, 600 U.S. 66, 143 S. Ct. 2106, nullified this court's prior decision.

This court, like the district court, is bound by our earlier precedent in this case. While "an intervening change in the law (such as by a Supreme Court case) permits a subsequent panel to decline to follow a prior Fifth Circuit precedent . . . [s]uch an intervening change in the law must be unequivocal, not a mere 'hint' of how the Court might rule in the future." *U.S. v. Alcantar*, 733 F.3d 143, 145–46 (5th Cir. 2013); *see also In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 331 (5th Cir. 2013) (to

overturn a prior precedent of this court, a "Supreme Court decision must be more than merely illuminating with respect to the case before us" and must be "unequivocally directed by controlling Supreme Court precedent." (quoting *Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 647–48 (5th Cir. 2012) (Dennis, J., concurring))). And importantly, a "district court [is] not free to overturn" Fifth Circuit precedent even if it thinks that the Supreme Court has "implicitly overruled" that precedent. *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 789, 792 (5th Cir. 2021).

In any event, the Supreme Court did not overturn our prior rulings in this case, explicitly or implicitly. *Counterman* held only that in a criminal conviction for a true threat of violence, the First Amendment "requires proof that the defendant had some subjective understanding of the threatening nature of his statements." 600 U.S. at 69, 143 S. Ct. at 2111. *Counterman* held that a speaker can be held civilly accountable for his speech if his "words were 'intended' (not just likely) to produce imminent disorder." *Id.* at 76, 143 S. Ct. at 2115. A jury can find that a protest leader who directs protestors to "interfere[] with traffic upon the public streets" intends to produce disorder because blocking a road represents an "immediate threat to public safety, peace, or order." *Cantwell v. Connecticut*, 310 U.S. 296, 308, 60 S. Ct. 900, 905 (1940); *see also Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (Sotomayor, J.) (citing *Cantwell* for the "axiomatic" proposition that blocking a street represents disorder). *Counterman*'s holding about the elements of an unrelated criminal offense changes nothing about this case. Therefore, the thorough First Amendment analysis in *Doe v. Mckesson* remains binding on the district court and should govern this case at trial. 71 F.4th at 289–300.

For these reasons, the judgment of the district court is REVERSED AND REMANDED to the district court for further proceedings consistent with this opinion.

No. 24-30494

Carolyn Dineen King, *Circuit Judge*, dissenting:

Officer John Ford was tragically injured in his line of duty. Someone should be held accountable. But Officer Ford has not come close to demonstrating that Mckesson is that someone. Perhaps eager to afford Officer Ford a remedy for his injuries, the majority nevertheless holds that he has done just that. In so doing, it imperils First Amendment liberties. So I dissent.

**I**

"The standard of review on summary judgment is *de novo*." *Favela v. Collier*, 91 F.4th 1210, 1212 (5th Cir. 2024). "Summary judgment is appropriate where the submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing Fed. R. Civ. P. 56(c)). "To make a showing of a genuine dispute of material fact, 'the party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim.'" *Clark v. City of Alexandria*, 116 F.4th 472, 478 (5th Cir. 2024) (quoting *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 171, 176 (5th Cir. 2016)). Then "we consider evidence bearing on the issues, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the nonmovant." *Chaney*, 595 F.3d at 229 (quoting *Olabisiomotosho v. City of Hou.*, 185 F.3d 521, 525 (5th Cir. 1999)).

"However, we are not required to accept the nonmovant's conclusory allegations, speculation, and unsubstantiated assertions [that] are either entirely unsupported[] or supported by a mere scintilla of evidence." *Id.* (citing *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.*, 336 F.3d 410, 413 (5th Cir. 2003)). The party opposing summary judgment

"must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). And it must do so by providing evidence capable of being "presented in admissible form at trial," *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019), rather than merely offering "improbable inferences," *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quoting *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015)). Further, "'[s]elf-serving allegations are not the type of significant probative evidence required to defeat summary judgment,' and 'a vague or conclusory affidavit [without more] is insufficient to create a genuine issue of material fact in the face of conflicting probative evidence.'" *Koerner v. CMR Constr. & Roofing L.L.C.*, 910 F.3d 221, 227(5th Cir. 2018) (quoting *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013)). "Therefore, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of . . . summary judgment.'" *Id.* at 227–28 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## II

Relying heavily on a prior panel's decision rendered at the motion-to-dismiss stage, the majority concludes that Officer Ford has presented sufficient evidence on each element of his negligence claim and that the First Amendment does not pose a barrier to that claim. But the case before us bears little resemblance to the case before the prior panel. In *this* case and on *this* record, I find it difficult to conclude that Officer Ford has raised fact issues on every element of his claim. And I find it even more difficult to conclude that the First Amendment lies dormant while its protections are chilled to the marrow.

No. 24-30494

## A

Under Louisiana negligence law, Officer Ford must prove or raise genuine issues of material fact on five elements: "(1) the plaintiff suffered an injury; (2) the defendant owed a duty of care to the plaintiff; (3) the duty was breached by the defendant; (4) the conduct in question was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty breached." *Doe v. Mckesson*, 71 F.4th 278, 288 (5th Cir. 2023) (internal quotes omitted). Officer Ford, however, has failed to present sufficient competent summary-judgment evidence on at least three of them: duty, breach, and cause-in-fact.

### 1

The Louisiana Supreme Court has identified a duty to "not negligently precipitate the crime of a third party." *Doe v. McKesson*, 339 So. 3d 524, 531 (La. 2022). This duty attaches if Mckesson was "organizing and leading the Baton Rouge demonstration." *Id.* Similarly, Officer Ford's theory of breach centers around Mckesson's organization and leadership of the Baton Rouge protest. *See Mckesson*, 71 F.4th at 288 ("[Officer Ford] has also plausibly alleged that Mckesson breached his duty in the course of the latter's organizing and leading the Black Lives Matter protest at issue here."). Accordingly, both the duty and breach elements rise and fall on the same proof of Mckesson's organization and leadership of the protest.

Before the prior panel, Officer Ford had an easier time establishing Mckesson's purported organization and leadership of the protest; the case was at the motion-to-dismiss stage, so his allegations were simply taken as true. It took as true Officer Ford's allegations "that Mckesson *planned* to lead the demonstrators onto Interstate 12," "that Mckesson *regularly gave orders* to the protestors and *directed* their activity," and that other unlawful acts "occurred under Mckesson's *leadership*." *Id.* at 288–89 (emphasis added).

18

And based on these allegations, that panel held that Officer Ford had "plausibly alleged that Mckesson breached his duty in the course of the latter's *organizing* and *leading* the Black Lives Matter protest at issue here." *Id.* (emphasis added).

The prior panel also concluded that Officer Ford "has alleged that Mckesson created unreasonably unsafe conditions in at least three significant aspects." *Id.* at 292. "First, he *organized* the protest to begin in front of the police station, obstructing access to the building." *Id.* (emphasis added). "Second, he *personally assumed control* of the protest's movements . . . ." *Id.* (emphasis added). "And third, Mckesson *deliberately led* the assembled protest onto a public highway, in violation of Louisiana criminal law." *Id.* (emphasis added).

Answering certified questions from this court, the Louisiana Supreme Court, too, relied on such allegations of protest organization and leadership. That court found that "Officer [Ford] has plausibly alleged that Mckesson breached his duty of reasonable care in the course of *organizing* and *leading* the Baton Rouge demonstration." *McKesson*, 339 So. 3d at 531 (emphasis added). "The complaint alleges that Mckesson *planned* to block a public highway as part of the protest. And the complaint specifically alleges that Mckesson *was in charge of the protests* and was *seen and heard giving orders throughout the day and night* of the protests." *Id.* (emphasis added).

Today, however, Officer Ford finds himself at the summary-judgment stage. So he must do more than simply allege; he must produce evidence. And reading the majority's opinion, one would be forgiven for believing that competent summary-judgment evidence bore out these allegations of organization and leadership. But what the majority describes as "ample evidence," *ante*, at 7, is simply not so.

Start with Mckesson's purported role in *organizing* the protest. The majority points to Mckesson's testimony that he was a "part of" a group of "incredible leaders who were planning things . . . associated . . . with the protest." *Ante*, at 7 (ellipses in original). But hidden in the ellipses between "planning things" and "associated" is Mckesson's clarification that there is no formal, centralized group of organizers—only community leaders. In fact, when asked "who [is] this planning group you're referencing," Mckesson stated, "when I say planning it's beautifully community lead [sic] so it's hundreds of people at any given point across the protests that I participated in or protesters that I knew whether I was there or not." And when asked "who is a person in the planning group," he further clarified that "[t]he planning group is not a proper noun remember, *so there's no group*. I use planning broadly. There were hundreds of people who were helping to plan associated things with the protest."

Moreover, contrary to the majority's characterization of the record, it is clear Mckesson was not one of these community leaders for the Baton Rouge protest. The majority thinks that Mckesson's admission that he came to Baton Rouge because his team was in contact "with leaders in 'the organizing community' who had 'asked [his team] to come,'" *ante*, at 7, somehow means Mckesson *was* a leader in the organizing community. But that defies logic. If the leaders of the Baton Rouge organizing community invited Mckesson to join their protest, Mckesson was a guest, not a host or an organizer.

Similarly, that Mckesson "'amplified' posts about the protest to his over quarter million Twitter followers so that they would know 'that there would be protests in Baton Rouge," *ante*, at 7, says nothing about his status as an organizer of the protest. Retweeting—something virtually anyone could do—evinces merely that Mckesson promoted, not organized, the protest. As Mckesson argues, "[r]e-tweeting the details of an already-planned protest no

more makes one its organizer than would re-tweeting the time or location of an outdoor movie screening or church rummage sale."

In short, far from creating fact issues on whether Mckesson was an organizer of the Baton Rouge protest, the evidence shows that Black Lives Matter protest-planning is decentralized and community-led; Baton Rouge's community leaders invited Mckesson to join their planned protest; and Mckesson retweeted the details of an already-planned protest. That is insufficient for a reasonable jury to conclude that he *organized* the protest at issue.

As for Mckesson's *leadership* of the protest, the majority draws unfounded inferences and improperly credits speculation. While, as the majority points out, Officer Ford testified that he thought Mckesson "was getting [people] ready to walk onto the highway," the basis for that thought was that Mckesson was "directing them with his body language moving around"—not anything Officer Ford heard personally. In fact, Officer Ford conceded that he "do[es]n't know what [Mckesson] said" to the crowd because "it was too loud." Sure, body language, such as pointing, can be a powerful tool of tacit communication. But what Officer Ford observed is far more speculative. When asked, "Did you see him making any hand gestures, signaling people, or anything like that," he responded, "I don't remember any signaling." So what did he mean by "body language"? Merely that "a crowd" was "following [Mckesson] all over the area" before they walked onto the highway. The majority makes no effort to reconcile this speculative leap from a crowd's following Mckesson—without any evidence of Mckesson's *causing* them to follow him—to Mckesson's actively "getting them ready to walk into the highway." Instead, the majority indulges in the speculation, which we may not. *See Moon v. Olivarez*, 26 F.4th 220, 226 (5th Cir. 2022) ("[Nonmovant] cannot defeat summary judgment with speculation . . . .").

21

The majority also points to the video depicting Mckesson's arrest. To reach its conclusion—that the video demonstrates, at a point in time that the video does *not* show, Mckesson was leading the crowd onto the highway— the majority purports to make observations and draw inferences therefrom: (1) "police officers cut off the protesters" and "the group turned around"; (2) "Mckesson is one of the people closest to the police officers who intervened to cut off the march"; (3) it thus could be inferred that Mckesson was "at the front of the protest as it was cut off by police"; and (4) that means he was leading the crowd before it was cut off. *Ante*, at 8. And, at this juncture, we are generally obligated to draw inferences in the light most favorable to Office Ford.

But the video does not show either (1) or (2), so the majority cannot infer (3) and (4). At no point in the video do "police officers cut off the protesters"; from the beginning to the end of the video, the police are behind the crowd. Nor does "the group turn[] around." The video *begins* with Mckesson and the crowd walking in one direction—and they never change direction.

More fundamentally, the video does *not* show that "Mckesson is one of the people closest to the police officers." *Ante*, at 8. What the video does show is Mckesson in the *middle* of the crowd. *See, e.g.,* Video at 00:12 (people walking in front of Mckesson); *id.* at 3:34 (various people behind Mckesson); *id.* at 4:18 (same); *id.* at 4:53 (same). This is so even though Mckesson stops a few times to record his video, as other protesters pass him, *id.* at 0:37, 2:32, and he even walks toward the back of the crowd to record another protester get arrested, *id.* at 3:36. This discrepancy between Officer Ford's version of events and the video means we no longer draw inferences in Officer Ford's favor; instead, we "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 381.

Tellingly, the video also fails to depict Mckesson shouting any orders, leading any chants, or directing anyone to do anything. In fact, the crowd continues to shout chants without any direction from Mckesson, and Mckesson does not join the chant. So contrary to the idea that this was a protest "that Mckesson personally directed *at all times*," *see Mckesson*, 71 F.4th at 289 (emphasis added), the only video evidence of the protest *never* shows him directing the protest.

The majority also cites to Mckesson's brief, which the majority reads as "admit[ting] his leadership role in the protest." *Ante*, at 8. The brief states that, "[a]t most, the evidence shows that Mckesson is a well-known leader in a social movement, that he attended the July 9 protest, and that he re-tweeted someone else's announcement of the Baton Rouge protest's time and location, and that some group of people followed him at various moments of the day." But each of these "admissions" do not admit his leadership role in *the protest*. First, being a leader in a *movement* is different from being a leader in a *protest*, especially given Mckesson's uncontroverted testimony that Black Lives Matter protest-planning is decentralized and community-led. Second, merely attending a protest does not make him liable for the conduct of other protesters. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982) ("Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence."). Third, retweeting the details of a pre-planned event does not make one an organizer or leader. And fourth, being followed, without additional nonspeculative evidence of Mckesson's conduct that *caused* the following, does not make him a leader.

The next two pieces of evidence the majority relies on suggest that the majority sees unwarranted talismanic powers in the word "leadership"—regardless of the context. First, the majority cites to Mckesson's participation in a class action lawsuit arising out of the protest. Per the

majority, "[h]is own court filings admit that he was a leader of the protest and argued that he was an adequate representative of the class of protesters who were arrested by the police due to the 'leadership' he exercised over them." *Ante*, at 9. But they do no such thing.

To be sure, he wrote there that he is an adequate class representative "due to [his] interest in this litigation, accessibility, involvement, leadership and commitment." Memorandum in Support of Motion for Final Approval of Class Action Settlement at 15, *McKesson v. City of Baton Rouge*, Civ. No. 16-520-JWD-RLB, 2017 WL 11675692 (M.D. La. Nov. 16, 2017).

The next paragraph, however, makes clear that the word "leadership" does not refer to his leadership of the *protest*. That paragraph begins with "[a]ll those terms apply to DeRay Mc[k]esson." *Id.* It continues, "[h]e has been a fearless young African-American man who has stood against racism, brutality and the right to exercise free speech throughout America." *Id.* And he has "committed to devoting time to this litigation and keeping the entire class informed." *Id.* Nowhere is there a discussion of Mckesson's leadership of the *Baton Rouge protest*. Instead, the filing discusses Mckesson's leadership within the Black Lives Matter *movement* and commitment to keeping the entire class informed—*i.e.*, his leadership of the *class action*. A generalized reference to leadership or possession of leadership qualities does not transform Mckesson into a leader of *this* protest.

The majority makes the same misstep when it cites to Mckesson's recognized leadership in the Black Lives Matter movement. *See ante*, at 9. True, he admitted that he was one of "many leaders in the Black Lives Matter Pride Movement." And he admitted that he met with President Obama and Attorney General Lynch, though he denied that he did so as a representative of the Black Lives Matter movement. But even if he met with the White House as a representative of the movement, that suffices to establish only

that he led the *movement*, not this particular *protest*. Again, Office Ford has failed to controvert Mckesson's testimony that protests were planned throughout the country by communities, not by a centralized group of leaders.

Perhaps Officer Ford's strongest argument is that he "saw and heard Mc[k]esson giving orders to the crowd." Yet in his own deposition, Ford admitted that he did not personally hear Mckesson "giving *any* orders."[1] This admission seemed to alarm Ford's counsel, who followed up: "When we gave you your admissions, we asked you, did you hear him giving orders, and you said you did. So is your — what's with your memory? Are you having memory problems? Are you confused?" To that, Officer Ford revised his testimony, stating "I did say that he told them to come out into the road, didn't I? . . . Well, that's — that's the only time then."

But say we credit this latter testimony.[2] It stands as the only evidence of Mckesson's purported leadership of the protest and precipitating the

---

[1] *See also, e.g.*, Ford Dep. 38:7–20 ("Q: [D]id you hear anything in particular that he said? A: Well, the casual conversations, no. There was too much traffic[,] and it was loud out there. But I could hear his chants and stuff like that . . . The main thing they started off with was no justice, no peace, no racist police . . . . Q: Besides that, did you hear him say anything else? A: Nothing personal, no."); 41:1–11 ("Q: [W]hat did you hear DeRay Mc[k]esson say? . . . A: That, like, the police were the new KKK . . . I can't recall anything else."); 96:10–14 ("Q: You personally did not hear him giving any orders, did you? A: Not personal orders, no, I didn't — I didn't hear him.").

[2] Of course, this is not a given because "[s]elf-serving assertions contradicting previous testimony are insufficient evidence to overcome a summary-judgment motion." *Barlow v. Allstate Tex. Lloyds*, 214 F. App'x 435, 437 (5th Cir. 2007) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996)); *see also Flaherty v. Entergy Nuclear Operations, Inc.*, 946 F.3d 41, 51 (1st Cir. 2019) (holding that, where witness "provided a clear answer to an unambiguous question during his deposition, which he then directly contradicted without satisfactory explanation," it was not error to reject witness' "claim of confusion" and to disregard the subsequent contradictory testimony); *Marathon Ashland Petrol, LLC v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, Helpers of Am., Gen. Drivers, Helpers & Truck Terminal Emp. Union, Lc. No. 120*, 300 F.3d 945, 951 (8th Cir.

crime of others. And such a one-time "order"—an unadorned characterization unsubstantiated by the record—cannot be enough to defeat a summary-judgment motion in a protest *leader* liability case. Otherwise, any protester could be haled into court and dragged through lengthy, costly litigation as a purported "leader" for simply shouting something as innocuous as "Let's go!" in the heat of the moment. This would, in effect, transform this narrow duty imposed on a protest organizer and leader into a "duty to protect others from the criminal activities of third persons"—which both this court and the Louisiana Supreme Court expressly rejected. *See McKesson*, 339 So. 3d at 532 (quoting *Doe v. Mckesson*, 945 F.3d at 818, 827 (5th Cir. 2019)). More concerningly, such loosening of the duty and breach standard poses grave First Amendment concerns, as explained below. *See infra*, Part II.B.

**2**

Officer Ford's evidentiary deficiency also plagues the cause-in-fact element. Under that element, he must prove, or at least raise genuine issues of material fact, that "he would not have been injured but for the manner in which Mckesson organized and led the protest." *Mckesson*, 71 F.4th at 292. That is, he must demonstrate "that Mckesson's actions were a necessary antecedent" to his injuries. *Id.* "That is a tall task, and the standard will only be met in the exceptional cases where" the evidence "support[s] the inference that the leader's specific actions caused the plaintiff's injuries." *Id.* The prior panel emphasized that "[i]n most cases, the altercation would have

───────────────

2002) (holding change in witness' deposition testimony after break and in response to own lawyer's questioning "was not a mere clarification of his earlier testimony, but was a 'sudden and unexplained revision' to create an issue where none existed before" and therefore did "not create an issue of disputed fact" (quoting *Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.*, 114 F.3d 108, 111 (8th Cir. 1997))).

occurred regardless of how the protest leader . . . acted." *Id.* at 292 n.8. Indeed, "[o]nly seldomly will a plaintiff be able to prove that the specific actions taken by the defendant caused the alleged injury." *Id.*

The majority asserts that, "[a]ccording to the state supreme court, the evidence could allow a jury to find that 'by leading the demonstrators onto the public highway and provoking a violent confrontation with the police, Mckesson's negligent actions were the "but for" causes of Officer [Ford's] injuries.'" *Ante*, at 12 (quoting *McKesson*, 339 So. 3d at 532). This assertion is flawed for two reasons.

*First*, the state supreme court never once said the *evidence* here could allow a jury to find anything at all, because it handed down *McKesson* at the motion-to-dismiss stage. *See McKesson*, 339 So. 3d at 521 ("We first note that this case comes before us from a dismissal on the pleadings alone."). Our task today is to decide whether Officer Ford has offered sufficient evidence to substantiate his allegations, not parrot a decision that took them as given.

*Second*, Officer Ford admits that Mckesson's purported shepherding of a crowd onto the highway did *not* cause a violent confrontation—*i.e.*, *cause* the crowd to hurl objects at the officers. Instead, he writes that "the crowd was already throwing objects at police and *had been doing so all day*, when Mc[k]esson lead [sic] them onto the highway." If the protesters were throwing objects at the police "all day," it seems clear that Mckesson's leading of the crowd onto the highway was not the "necessary antecedent" of Officer Ford's injury. *See Mckesson*, 71 F.4th at 292. In fact, this case would fall alongside "most cases" where "the altercation would have occurred [and did occur] regardless of how the protest leader . . . acted." *See id.* at 292 n.8.

And just as the crowd was throwing objects at the police without any action on Mckesson's part, the record shows they likely would have occupied the highway without him too. Officer Ford testified that there were

"agitators" in the crowd who were "trying to get the crowd to come back into the roadway." In fact, it was when Officer Ford was arresting one of these agitators—not Mckesson—that he was struck with a rock. So again, it seems the highway occupation "would have occurred regardless of how the protest leader . . . acted." *Id.*

The majority also concludes that a jury can find Mckesson as the cause-in-fact of Officer Ford's injuries because Mckesson "organized and directed the protest in such a manner as to create an unreasonable risk that *one protester* would assault or batter [Officer Ford]." *Ante*, at 13 (emphasis added) (quoting *id.* at 829). Indeed, the crux of Officer Ford's claim against Mckesson is that "Mckesson should have known that leading the demonstrators onto a busy highway was likely to provoke a confrontation between the police *and the mass of demonstrators*, yet he ignored the foreseeable danger. . . ." *Mckesson*, 71 F.4th at 288.

But here is the catch—Officer Ford has produced *zero* evidence that the unidentified rock-thrower was a protester at all. Zero evidence is, of course, even less than a mere scintilla of evidence, which is insufficient to overcome a summary judgment motion. *See Chaney*, 595 F.3d at 229. And without that evidence of a protester-rock-thrower, we have no basis to conclude that Mckesson in fact caused "one protester" or someone in the "mass of demonstrators" to assault or batter Officer Ford.

**3**

In sum, when unsupported, unsubstantiated allegations are stripped away, the sole remaining evidence in support of Officer Ford's claim is a self-contradicted testimony that Mckesson told people, just once, that they should go onto the highway. Officer Ford has failed to present any other evidence of Mckesson's organization and leadership of the protest or

evidence of sufficient causal relationship between Mckesson's actions and his injuries. He therefore cannot survive summary judgment.

**B**

Officer Ford's failure to establish the state-law elements also means his claim is barred by the First Amendment. The majority treats the First Amendment issue as foreclosed by the previous panel's decision in *Mckesson* and our adherence to the rule of orderliness. *Ante*, at 14–15. But not only do Officer Ford's evidentiary shortcomings render the rule of orderliness inapplicable, the majority's holding is flawed on its own terms.

**1**

At the motion-to-dismiss stage, when Officer Ford's allegations were taken as true, a divided panel of this court held that "imposing negligence liability on Mckesson does not offend the First Amendment." *Mckesson*, 71 F.4th at 291. Specifically, it held so because, in its view, "the negligence theory [Officer Ford] pursues fits quite comfortably into two of the theories for protest-leader liability identified in" *Claiborne*.[3] *Id.*

---

[3] In *Claiborne*, African American citizens of Claiborne County instituted a boycott on white merchants in the area when their demands to elected officials for racial equality and integration were unmet. *Claiborne*, 458 U.S. at 889. An undisputed leader of the boycott was Charles Evers, the Field Secretary of the N.A.A.C.P., who helped organize the Claiborne County Branch of the N.A.A.C.P. *Id.* at 898. On one occasion, he gave a speech to a crowd and led them on a march to the courthouse, demanding the discharge of the entire city police force, after some officers shot and killed a young African American male. *Id.* at 902. In that speech, he warned that "boycott violators would be 'disciplined' by their own people." *Id.* On another occasion, he gave a speech to "several hundred people," during which he stated that "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck." *Id.* And indeed, boycott violators faced some "discipline," including being physically battered, shots being fired at their house, a brick thrown at their windshield, or personal property damaged or stolen. *Id.* at 904–05.

Those theories are as follows. "First, a finding that he authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity." *Claiborne*, 458 U.S. at 927. "Second, a finding that his public speeches were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period." *Id.*

The majority in *Mckesson* held that the first theory of liability was met because Mckesson "'directed . . . specific tortious activity' insofar as [Officer Ford] contends 'that his injuries were the result of Mckesson's *own* tortious conduct in *directing* an illegal and foreseeably violent protest." *Mckesson*, 71 F.4th at 291 (first emphasis in original; second emphasis added). It then held that the second theory was met because Officer Ford "contend[ed] that Mckesson *organized* and *directed* the protest in an unsafe manner such that it was likely that a violent confrontation would result, and in fact did result." *Id.* at 293 (emphasis added).

But as shown above, Mckesson did not organize or direct the protest. At best, Officer Ford's self-contradicted testimony shows that Mckesson directed *one* movement of the protest at a specific moment in time. This is far afield of the allegations underlying *Mckesson*, which were that Mckesson "*planned* to lead the demonstrators onto Interstate 12," "*regularly gave orders* to the protesters," "*personally assumed control* of the protest" and "personally directed [it] at all times." *Id.* at 288–89, 92 (emphasis added). This factual discrepancy between the allegations assumed as true in *Mckesson*

_____

Despite his undisputed leadership and explicit call for violence, the Supreme Court refused to pierce the First Amendment and impose liability on Evers for the wrongful conduct of others. *Id.* at 929.

and what the evidence actually bears out means we no longer can rely on *Mckesson* or hide behind the rule of orderliness.

**2**

More troublesome than applying non-analogous caselaw, the majority's holding today greenlights a form of "heckler's veto." We have said that "it is not acceptable for the state to prevent a speaker from exercising his constitutional rights because of the reaction to him by others." *Beckerman v. City of Tupelo*, 664 F.2d 502, 509 (5th Cir. Unit A Dec. 1981). But by not insisting that Officer Ford show proof that the rock-thrower is a *protester*, rather than a bystander or even a counterprotester, the majority makes every protest a hostage to "the reaction . . . by others." *Id.*

Indeed, under today's decision, the violence "even of those *opposed* to the protest" may lead to civil liability for a protest leader "on the theory that such violence was 'foreseeable.'" Timothy Zick, *The Cost of Dissent: Protest and Civil Liabilities*, 89 Geo. Wash. L. Rev. 233, 273 (2021) (emphasis in original). Even worse, someone opposed to a planned protest can simply *threaten* violence. In that case, the protest leader cannot deny foreseeability and must now choose between exercising his First Amendment rights or facing potentially ruinous liability.[4] *Cf. N.Y. Times Co. v. Sullivan*,

---

[4] Perhaps the majority would respond that, in such a case, "the altercation would have occurred regardless of how the protest leader . . . acted," *Mckesson*, 71 F.4th at 292 n.8, undercutting the causation element. And I would tend to agree. But by ignoring Officer Ford's own testimony that the protesters were throwing objects at officers and that agitators were encouraging the crowd to walk onto the highway regardless of Mckesson's conduct, the majority has ditched that guardrail.

Nor is the response the majority actually gives any more reassuring. It writes that a protest leader cannot be held liable for the conduct of counterprotesters because "a protest leader must have 'organized and directed' the *protestor's* actions" to incur liability. *Ante*, at 13 (quoting *Mckesson*, 71 F.4th at 289). That fundamentally misunderstands *Mckesson*, the very case the majority contends governs this one.

No. 24-30494

376 U.S. 254, 277 (1964) ("The fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute."). That would, of course, impermissibly chill speech and violate the tenet that, "in the context of constitutionally protected activity . . . 'precision of regulation is demanded.'" *Claiborne*, 458 U.S. at 916.

Moreover, by hinging Mckesson's liability on the "foreseeab[ility] that the Baton Rouge police would be required to respond to the demonstration," *ante*, at 11, the majority "allows law enforcement to dictate the extent of protesters' liability exposure," Zick, *supra*, at 273. This is "heckler's veto" on steroids because now the heckler is the government. Instead of exercising its lawmaking powers to suppress speech it dislikes— and face strict scrutiny—the government can unleash its law enforcement officers, armed with riot gear and today's decision, upon its citizens, including, as in this case, its dissidents. This obvious danger of handing the protester-liability trigger to the government is made worse because "almost anyone can be arrested for something." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1730 (2019) (GORSUCH, J., concurring in part and dissenting in part). And

---

That case held that, under the alleged facts, Mckesson can be held liable because he "organized and directed *the protest* in such a manner as to create an unreasonable risk that one protester would assault or batter [Officer Ford]." *Mckesson*, 71 F.4th at 289. It is the manner in which a protest leader organizes and directs the *protest* that may trigger liability, not the way he organizes and directs the *people*. Indeed, JUDGE WILLETT's dissent there argued for what the majority today asserts—to hold a protest leader liable, two things must be identified: "a 'specific' tort committed by someone other than [the leader], and an action by [the leader] that 'authorized, directed, or ratified' that tort." *Id.* at 310 (WILLETT, J., concurring in part, dissenting in part). But, as he observed, "the [*Mckesson*] majority's analysis blend[ed] those two steps by [holding] that Mckesson 'directed' *his own* tort." *Id.*; *see also id.* at 292.

Today's majority seeks to both rest on *Mckesson*'s holding and retroactively un-blend its analysis. But precisely because it cannot rewrite that case, the majority's holding poses a threat to the First Amendment.

this danger is more likely to manifest when the government is itself the object of the protest, as it was here. Dangerously, that threatens First Amendment rights when they are needed the most—when the speech concerns public affairs. *See Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."); *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values . . . ."); *N.Y. Times Co.*, 376 U.S. at 270 (articulating "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . .").

**3**

The prior panel's decision in *Mckesson* is inapplicable, and the majority's approach imperils First Amendment liberties. But there is an alternative, well-trodden path for us to take: simply hew closely to the "historic," "traditional," "well-defined[,] and narrowly limited classes of speech" that the Supreme Court has identified as unprotected by the First Amendment and see whether they apply here. *See United States v. Stevens*, 559 U.S. 460, 468–69 (2010). These are defamation, obscenity, true threats, and incitement. *Counterman v. Colorado*, 143 S. Ct. 2106, 2114 (2023) (collecting cases). Of these categories, the closest one to the facts at hand would be incitement. But it is not close enough still.

I start with well-established principles. "First Amendment freedoms need breathing space to survive." *FEC v. Wis. Right to Life, Inc.*, 552 U.S. 449, 468–69 (2007) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Accordingly, we are cognizant that "[p]rohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Counterman*, 143 S. Ct. at 2114. "A speaker may be unsure about the side of a line on which his speech falls." *Id.* at 2114–15. "Or he may simply be concerned about the

expense of becoming entangled in the legal system." *Id.* at 2115. "The result is 'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)). So "an important tool to prevent that outcome—to stop people from steering 'wide[] of the unlawful zone'—is to condition liability on the [plaintiff's] showing of a culpable mental state." *Id.* (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

The same tool is necessary in the incitement context. Incitement is when an "advocacy of the use of force or law violation . . . is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)). But "incitement inheres in particular words used in particular contexts: Its harm can arise even when a clueless speaker fails to grasp his expression's nature or consequence." *Counterman*, 143 S. Ct. at 2115. So, the Supreme Court instructs, "the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Id.* (citing *Hess*, 414 U.S. at 109).

The need for a *mens rea* requirement for incitement is particularly strong. That is because the Court "recognized that incitement to disorder is commonly a hair's-breadth away from political 'advocacy'—and particularly from strong protests against the government and prevailing social order." *Id.* at 2118 (citing *Brandenburg*, 395 U.S. at 447). But the Court "fail[ed], in an earlier era, to protect mere advocacy of force or lawbreaking from legal sanction." *Id.* So a "strong intent requirement" is "a way to ensure that efforts to prosecute incitement would not bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core." *Id.* Even the *Mckesson* panel acknowledged this, writing, "imposing liability on associates without an intent requirement

would risk discouraging a whole range of legitimate expressive activities." *Mckesson*, 71 F.4th at 297. And, as explained above, the evidence shows that Mckesson was merely an associate—not a protest leader.

Here, of course, Officer Ford has testified—albeit inconsistently—that Mckesson told some people to go on the highway. And if he told people to go on the highway, Mckesson very likely intended people to go on the highway and to do so imminently. At first glance, it may appear Mckesson's speech was unprotected incitement.

But that focuses on the wrong lawless action. Mckesson is not being prosecuted or sued for illegally occupying the highway. *See Mckesson*, 71 F.4th at 298 ("[Officer Ford] does not assert highway obstruction as a tort *per se*."). He is being sued because an unidentified, perhaps-unassociated person threw a rock at Officer Ford without Mckesson's direction, ratification, or authorization. The relevant question thus is not whether he intended the illegal highway occupation, but whether he "intended (not just likely) to produce" that lawless action of throwing a rock at Officer Ford. *See Counterman*, 143 S. Ct. at 2115. And Officer Ford does not allege, contend, or present evidence that Mckesson intended to produce the rock throwing.

The majority's approach of using the highway occupation to impose liability on the downstream occurrence of rock-throwing contravenes the above-outlined principles. It imposes a civil punishment via a mere negligence standard. So now, under the majority's regime, "a clueless speaker [who] fails to grasp his expression's nature and consequences" could be civilly punished, *id.*, even if he does not intend the consequences. This is an end-run around the "strong intent requirement"—a necessary safeguard to preserve the First Amendment's "breathing space"—where an intent to commit any minor crime opens the floodgates for indefinite liability.

No. 24-30494

"[T]he 'tendency to lead to violence' is not enough. Mere negligence, therefore, cannot form the basis of liability under the incitement doctrine any more than it can under the libel doctrine." *Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023) (quoting *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017, 1024 (5th Cir. 1987)). The First Amendment demands more.

### III

"[I]t is of prime importance that no constitutional freedom, least of all the guarantees of the Bill of Rights, be defeated by insubstantial findings of fact screening reality." *Claiborne*, 458 U.S. at 924. But today, the majority couples insubstantial findings of fact with imprecision of regulation to strike at the heart of the First Amendment. Because "First Amendment freedoms need breathing space to survive," *Wis. Right to Life, Inc.*, 551 U.S. at 468–69, and the majority suffocates them, I respectfully dissent.